THE MCLEAN HOSPITAL CORPORATION *VS.* TOWN OF
BELMONT & others.[1]

No. 00-P-1198.

Suffolk. March 20, 2002. - November 22, 2002.

Present: GREENBERG, LENK, & COWIN, JJ.

*Zoning,* Contract zoning. *Municipal Corporations,* Police power.

A zoning amendment enacted by the defendant town and affecting property
owned by the plaintiff hospital was a valid exercise of the town's zoning
authority and did not constitute illegal contract zoning, where the amend-
ment served the interests of the town and did not involve extraneous
consideration, and therefore, this court affirmed a decision of the Land
Court declaring the amendment to be valid [544-548]; moreover, various
arguments put forth by intervener town residents in the action did not alter
this court's conclusion that the rezoning was within the town's police
power [548-549].

CIVIL ACTION commenced in the Land Court Department on
July 21, 1999.

The case was heard by *Mark V. Green,* J., on motions for
summary judgment.

*Gregor I. McGregor* (*Michael J. O'Neill* with him) for the
interveners.

*Diane C. Tillotson* (*Stephen W. Kidder* with her) for the
plaintiff.

*Paul R. Mordarski* for the defendant.

COWIN, J. The interveners challenge[2] a judgment of the Land
Court declaring that a zoning amendment enacted by the town

---

[1]Suzanne Bass, Rosemary Chase, Ann Sifneos, James Graves, Jonathan
Bush, Sarah Bush, Sharon Vanderslice, Martha J. Eakin, Anton Boghossian,
Lorraine Vona, and Lynne Cook Polcari, interveners. All but the intervener
Polcari are appellants herein.

[2]The Land Court judge assumed, but did not decide, that the interveners
have standing to pursue their objections. Neither McLean nor the town chal-

of Belmont (town) and affecting property owned by the McLean Hospital Corporation (McLean) is a valid exercise of the town's zoning authority and does not constitute illegal contract zoning.[3] The interveners assert that the rezoning represents an unlawful bargaining away of the town's police power pursuant to a bilateral contract that bound the town to rezone in McLean's interest; that the contract contains elements that are contrary to public policy; and that the contract sets forth consideration for the town's action that the town might never be able to collect. The interveners also characterize the town's action as unlawful spot zoning and challenge the timing of the rezoning vote in relation to execution of the parties' written agreement. We discern no error in the judge's handling of this complex subject matter. The judge accurately identified the relevant criteria and properly applied the standards to the facts of the case. We affirm.[4]

1. *Relevant facts and prior proceedings.* The material facts are not disputed. McLean owns approximately 238 acres (the locus) in Belmont. It is a teaching hospital that has provided inpatient and outpatient psychiatric care, as well as related services, for more than a century. Prior to the rezoning that is the subject of this action, the locus was situated in a "single residence D" zoning district, with McLean conducting its operations as a nonconforming use. See G. L. c. 40A, § 6. The locus is bordered on the northeast and northwest by residential zoning districts and on the southeast by local business districts.

For an extended period, McLean had maintained a majority of the acreage of the locus as undeveloped open space. However, financial considerations in the mid-1990's led McLean to decide either to develop or divest itself of approximately 190 acres, leaving approximately forty-eight acres on which to continue its

lenges the interveners' standing on appeal, and we likewise proceed on the assumption that standing is present.

[3]The judge's declaration upholding the amendment did not include a portion thereof that dealt with a cemetery subdistrict that had been disapproved by the Attorney General. See G. L. c. 40, § 32.

[4]When before the Land Court, the interveners also asserted various claims of procedural defects with respect to the adoption of the rezoning. These claims are not argued in the interveners' brief, and are, therefore, waived. Mass.R.App.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

traditional operations. To that end, McLean representatives participated with municipal officials and appointed private citizens in the formation of a "McLean Hospital Land Use Task Force" (task force) charged with reviewing possible uses of the locus.

With the assistance of consultants, and having received input from a variety of local and regional sources, the task force adopted a statement of principles setting forth certain municipal objectives for development of the locus, including protecting the natural and historic character of the locus; minimizing adverse impacts of new development on the quality of life in the town; generating additional tax revenue; acquiring land for town purposes; and supporting private development consistent with public needs. The statement of principles was subsequently approved by the selectmen.

While this was taking place, McLean presented various development proposals that were rejected by the task force. During the following year, McLean presented a revised proposal, one that was further revised following public hearings, meetings, and comments. This led to the preparation by McLean and the town of a "memorandum of understanding" summarizing the development proposal as refined on the basis of the task force reviews and the accompanying public proceedings. The memorandum of understanding contemplated a rezoning of the entire site, together with a number of commitments generally, but not exclusively, of benefit to the town.[5]

Pursuant to the memorandum of understanding, the town embarked on a process leading to a comprehensive rezoning of the locus. The procedures followed are set forth in detail by the Land Court judge, and it is unnecessary to reiterate them. Suffice it to say that the process described above generated a

---

[5]The commitments included legal protection for significant historical features; acquisition by the town of interests in the locus, including title to a major portion thereof for open space and a cemetery; creation of a public-private partnership for management of the open space; obtaining of a tax exemption for that portion of the locus devoted to hospital operations; a traffic management agreement; revenue sharing between McLean and the town in the event that McLean's net land sale revenues exceeded $28 million; commitments with respect to affordable housing and additional recreational benefits; and reimbursement by McLean of the town's consultant fees.

proposed amendment to the Belmont zoning by-law that, following revisions based on planning board proceedings and consultant recommendations, was substantially similar to the proposal contained in the memorandum of understanding, except with the earlier proposed sharing of land sale proceeds eliminated. The proposed amendment established a McLean zoning district comprised of six subdistricts: (i) residential; (ii) senior living; (iii) research and development; (iv) McLean institutional; (v) open space; and (vi) cemetery. Detailed provisions regarding permitted uses, dimensions, access, and parking were included.

A special town meeting was scheduled. Article 2 of the town meeting warrant contained the proposed zoning amendment. Article 3 of the warrant proposed authorizing the selectmen to enter into a memorandum of agreement with McLean that incorporated various elements of the parties' understandings to date including the conveyance by McLean to the town of fourteen acres for a town cemetery; 78.5 acres for public open space; and public access rights in twenty-seven areas of privately owned open space. The memorandum also called for McLean to pay to the town $1,000,000 for traffic improvements related to the rezoning and future development, as well as $500,000 for reimbursement of the town's consultant fees. Article 4 of the warrant would, if adopted, authorize the selectmen to accept conveyance of the land and rights referred to above, while article 5 proposed authorizing the selectmen to petition the Legislature to enact an exemption from real estate taxes of certain of McLean's property in accordance with the memorandum of agreement contained in article 3.

The town planning board recommended approval of the amendment. Discussion at the town meeting took place concurrently on articles 2 through 5, and continued through two adjournments of the meeting. A vote was taken on article 2 (the rezoning) and the article failed to receive the two-thirds majority required for zoning by-laws and amendments. See G. L. c. 40A, § 5. Articles 3 through 5 were dismissed on separate motions. Upon the statement of a member that he intended to move for reconsideration of each of the four articles, a vote to adjourn carried.

During the adjournment, the parties prepared a revised proposal that reflected certain concerns expressed at the earlier meeting sessions. The revisions principally reduced the maximum square footage in the research and development subdistrict; eliminated the $500,000 reimbursement by McLean of the town's consultant expenses; reduced from $1,000,000 to $800,000 the amount McLean would pay to the town for traffic mitigation; and provided for a payment by the town to McLean of $1,500,000.[6] Thus, the changes in the proposal resulted in a net cost to the town of $2.2 million.

At the continued town meeting, the members voted over-whelmingly to reconsider articles 2 through 5. A variety of amendments were considered.[7] After discussion, article 2 passed by more than a two-thirds vote. Articles 3 through 5, with appropriate conforming amendments, also passed. Subsequently, at a special town election conducted pursuant to petition, see G. L. c. 39, § 10, the action of the town meeting on the four articles was approved by a vote of approximately 69.5 percent in favor and approximately 30.5 percent against. With the exception of the amendments relating to the cemetery subdistrict, the rezoning was approved by the Attorney General. See G. L. c. 40, § 32. Shortly thereafter, McLean and the town executed the memorandum of agreement incorporating the parties' various commitments to each other.

2. *Discussion.* The interveners characterize the alleged illegality of the rezoning in various ways: specifically, as a bargaining away of the town's police power; as a bilateral agree-

---

[6]The revised proposal also contained an agreement by McLean to grant the town an option to purchase up to sixteen lots contiguous to the open space subdistrict at a purchase price of $200,000 each. It also provided for the timing of the $1,500,000 payment by the town and the conveyances by McLean; evidence of compliance by McLean with its ancillary agreements as part of a site plan review process; and agreement by McLean that any change from a psychiatric use at the locus to a nonpsychiatric use would require site plan review.

[7]The amendments involved an increase in the maximum gross floor area within the senior living subdistrict; a reduction in the maximum gross floor area within the research and development subdistrict; a change in the limitation of nonpsychiatric medical uses in the McLean institutional subdistrict; and four amendments pertaining to the cemetery subdistrict that were subsequently disapproved by the Attorney General and are not encompassed by the Land Court's declaration.

ment that created a duty on the part of the town to rezone; and as an exercise of governmental authority in the interest of the private landowner, rather than in the interest of the town. We view these assertions as different expressions of one argument, i.e., that the rezoning was a product of so-called contract zoning and, therefore, unlawful.

Illegal contract zoning has been defined as a "process by which a local government enters into an agreement with a developer whereby the government extracts a performance or promise from the developer in exchange for its agreement to rezone the property." 3 Rathkopf, Zoning & Planning § 44:11 (Ziegler rev. ed. 2001). The process is suspect because of the concern that a municipality will contract away its police power to regulate on behalf of the public in return for contractual benefits offered by a landowner whose interest is principally served by the zoning action. See *Rando* v. *North Attleborough*, 44 Mass. App. Ct. 603, 607 (1998). The interveners here employ the label "contract zoning" as an epithet that suggests that zoning action taken in connection with any agreement with an affected landowner is unlawful. This is wrong as a general proposition. The existence of an agreement per se does not invalidate related zoning actions; it is the nature of the agreement and the character of the zoning action that determine the outcome.

Attacks on zoning enactments as unlawful contract zoning have been considered twice to date by our appellate courts. Each case featured an agreement between the municipality and the developer; in neither case did the court invalidate the zoning action. In *Sylvania Elec. Prod. Inc.* v. *Newton*, 344 Mass. 428 (1962), the landowner agreed that, should the city rezone a potential parcel from a single residence district to a limited manufacturing district, it would restrict its uses of the parcel in various ways and convey to the city an option to purchase a portion of the property. It was clear that the respective undertakings were contingent on each other or, as the court expressed it, "the option proposal was a significant inducement of the zoning amendment and the amendment induced the giving of the option." *Id.* at 433.

The mutual dependence of the parties' commitments did not

by itself render the zoning aspect invalid. This was true notwithstanding that local "officials let it be known that favorable rezoning depended in great likelihood on the adoption of the option restrictions." *Id.* at 436. Nor did it "infringe zoning principles that, in connection with a zoning amendment, land use [was] regulated otherwise than by the amendment. Zoning regulations . . . exist unaffected by, and do not affect, deed restrictions." *Id.* at 434. In other words, the zoning action, *if otherwise valid,* stands by itself and its legitimacy is not lessened because it was accompanied, and even encouraged, by ancillary agreements not involving consideration extraneous to the property being rezoned. *Ibid.* In *Sylvania,* the zoning decision that the locus, as restricted by the owner, should be a limited manufacturing district "was an appropriate and untainted exercise of the zoning power. What was done involved no action contrary to the best interest of the city and hence offensive to general public policy." *Ibid.*

*Rando* v. *North Attleborough, supra,* is to the same effect. There, a developer sought a rezoning of land from a residential district to a commercial district. *Id.* at 604. As an inducement to the town, the developer offered various accommodations, including a "no build" buffer zone, traffic improvements, mitigation payments, and a commitment not to seek tax abatements with respect to the rezoned land for five years. *Id.* at 605. The plaintiffs argued that the town had bargained away its police powers in return for the promised benefits. *Id.* at 607. Likening the objection to that in the *Sylvania* case, this court held warranted the finding of the trial judge that the town meetings had not been "improperly influenced to act on behalf of the developer rather than in the best interests of the town." *Id.* at 610-611. In addition, the court agreed that the benefits promised by the developer did not constitute "extraneous consideration," stating, "We do not think a payment that is promised by the developer rather than required by the municipality and that is reasonably intended to meet public needs arising out of the proposed development can be viewed as an 'extraneous influence' upon a zoning decision." *Id.* at 609.

Thus, challenges to zoning enactments on the basis that they are products of contract zoning provoke two questions: (1) was

the action "contrary to the best interest of the city and hence offensive to general public policy"; and (2) did it involve extraneous consideration "which could impeach the enacting vote as a decision solely in respect of rezoning the locus?" *Sylvania Elec. Prod. Inc.* v. *Newton, supra* at 434; *Rando* v. *North Attleborough, supra* at 608. We are not persuaded by the interveners' assertion that the Land Court judge "understated the principles of *Sylvania* and *Rando*." The judge expressed the two questions as whether the undertakings incorporated into the memorandum of agreement exerted improper influence on the town to rezone for McLean's benefit rather than in its own best interest, and whether McLean had promised extraneous consideration unrelated to the subject matter of the rezoning. The judge's statement of the two factors seems to us to be completely faithful to the thrust of the earlier decisions.

In determining whether the rezoning challenged here satisfied the criteria of *Sylvania* and *Rando*, we apply the standard that a party attacking a zoning amendment has a heavy burden, one requiring that he "prove by a preponderance of the evidence that the zoning regulation is arbitrary and unreasonable, or substantially unrelated to the public health, safety, morals, or general welfare." *Johnson* v. *Edgartown*, 425 Mass. 117, 121 (1997). He must demonstrate that the validity of the enactment "is not even fairly debatable." *Crall* v. *Leominster*, 362 Mass. 95, 103 (1972). If the validity of the zoning action is fairly debatable, local judgment on the subject should be sustained. *National Amusements, Inc.* v. *Boston*, 29 Mass. App. Ct. 305, 309 (1990).

Here, the interveners have not demonstrated that the interests of Belmont are not served by the rezoning. Indeed, while McLean's interests are obviously enhanced, a factor that does not discredit the zoning action, see *Lanner* v. *Board of Appeal of Tewksbury*, 348 Mass. 220, 229-230 (1964), the benefits that flow to the town from the agreement are obvious. The town faced a situation in which McLean could develop the unused portion of its property into single family residences and had an immediate economic incentive to do so. McLean agreed to surrender this right, a concession of clear benefit to the town, on condition that the locus be rezoned; that McLean receive from

the town a payment of $1,500,000; and that the town cooperate in an effort to obtain for McLean tax relief that is ordinarily enjoyed by institutions of similar character. The town received not only elimination of the potential for an undesired residential development of the locus, an accomplishment that by itself would appear to satisfy the requirement that the zoning be for a public purpose, but also open space; a cemetery; protection for significant historical features; commitments with respect to affordable housing and recreational benefits; and a traffic management agreement. The town meeting could lawfully conclude that the rezoning, given these commitments by the landowner, was substantially related to the general welfare. See *Sylvania*, 344 Mass. at 434. It was not improperly influenced to act on behalf of the developer rather than in the best interests of the town. See *Rando*, 44 Mass. App. Ct. at 610-611.

The consideration flowing to the town under the agreement is not "extraneous" in the sense used in *Sylvania, supra*, and *Rando, supra*. "It involved no extraneous consideration (as, for example, a request to give land for a park elsewhere in the city) which could impeach the enacting vote as a decision solely in respect of rezoning the locus." *Sylvania, supra*. The consideration in question here is not a gift or other action unrelated to the locus; nor is it a payment to the town's general fund. See *Rando, supra* at 609. Rather, each element of such consideration was reasonably related to the locus being rezoned. We believe it too narrow to require that, in order not to be labeled extraneous, consideration must directly "mitigate" some deleterious effect of the development authorized by the rezoning (although such consideration would obviously be permissible). Rather, it is adequate that the consideration bear some identifiable relationship to the locus so that there can be assurance that the town's legislative body did not act for reasons irrelevant to the zoning of the site at issue. This requirement was satisfied here.

The interveners' remaining arguments do not alter our conclusion that the McLean rezoning was within the town's police power. *Rando, supra* at 607, does not hold that the agreement that accompanies the zoning action must be executed and placed in escrow as a condition to the validity of the town's zoning vote. The rezoning was not conditioned on the agreement, nor

could it lawfully have been so conditioned. It stands in its own right and is not dependent on performance of the agreement. The determination of the rights of a municipality in the event of the landowner's breach of such an agreement is for another day and on another record.[8]

The rezoning having been adopted for a valid public purpose in relation to an area that is discrete in its geography, contours, and size, it is not spot zoning. See *Board of Appeals of Hanover* v. *Housing Appeals Comm. in the Dept. of Community Affairs*, 363 Mass. 339, 361-362 (1973); *National Amusements, Inc.* v. *Boston*, 29 Mass. App. Ct. at 312-313. Nor is the rezoning a product of a bilateral contract that bound the town to rezone solely in consideration of the promises of the landowner. The rezoning was not a term of a contract. It was a condition that had to be fulfilled before a separate agreement became enforceable. "In this situation, the municipality makes no promise and there is no enforceable contract until the municipality acts to rezone the property." *Rando*, 44 Mass. App. Ct. at 610 n.6, quoting from *Dacy* v. *Ruidoso*, 114 N.M. 699, 703-704 (1992). Finally, given that we identify nothing in the agreement that violates public policy insofar as the ancillary commitments are concerned, it is unnecessary to address what the effect on rezoning would be if a landowner induced such rezoning by making unlawful promises.

3. *Conclusion.* We see nothing in the Zoning Act, G. L. c. 40A, §§ 1 et seq., or in other applicable legal principles that prohibits a municipality from negotiating with a private landholder to bring about the receipt of benefits for desirable public purposes once otherwise valid zoning has taken place, assuming that those benefits have some reasonable relationship to the site governed by the zoning. Indeed, such arrangements are consistent with good government in general and with effective land use planning in particular. On the present record, summary judgment in favor of McLean and the town was proper.

*Judgment affirmed.*

---

[8]It should be noted that the agreements in the present case have been executed and delivered.