Nickerson, Gary A., J.

INTRODUCTION

The plaintiff Shoestring Limited Partnership (“Shoestring”) filed this Superior Court action in the nature of certiorari pursuant to G.L.c. 249, §4. The plaintiff seeks review of the decision by the defendant Barnstable Conservation Commission (“Commission”) to grant a wetlands by-law order of conditions to Dockside Realty Trust (Dockside). After the filing of the administrative record, Shoestring moved for judgment on the pleadings pursuant to Mass.R.Civ.P. Rule 12(c), and Dockside opposed.[2] The court heard the motion on November 16, 2004.

BACKGROUND

The following facts are taken from the administrative record. On April 25, 2002, Dockside filed a notice of intent (NOI) with the Commission, seeking permission to overhaul an existing marina by creating a new complex of piers and floats, to dredge the existing channel and to construct an ancillary building at 110 School Street, a site on Hyannis Inner Harbor. As of April 25th, Dockside had entered into an agreement to purchase the site from Shoestring. Dockside filed its NOI in anticipation of title passing, but the NOI bore the signature of neither Dockside nor Shoestring.[3]
The Commission held a public hearing on May 14, 2002, with all seven commissioners in attendance. Wayne Kurker, on behalf of Dockside, presented the proposal. Kurker is the operator of the Hyannis Marina, a successful nearby full-service marina. As originally proposed, the project was intended to significantly reconfigure the existing system of piers and floats tethered to 110 School Street. Dockside proposed to dredge 8,900 cubic yards of material from the channel to accommodate the increased boat traffic. Dockside wished to replace a shed on the property with a new 2,275 square-foot building to service its customers. The building would be staffed by a resident caretaker, who would manage a refurbished pump out station and other boating services. Kurker spoke of his vision of how the project would fit in with the surrounding properties, including an abutting town-owned dock and a nearby restaurant. Dockside also presented the results of an analysis conducted by a scientist from the Woods Hole Group, which concluded that the project would benefit the area. The Commission questioned Kurker on various aspects of his proposal, including wastewater runoff, hazardous waste disposal, and sewerage. The Commission heard commentary from Shoestring’s legal representative, who testified that he had not been previously informed as to the project’s scope, and expressed his client’s serious concerns about possible negative effects on Shoestring’s adjacent restaurant properly. Shoestring concluded by noting it could not support the project as proposed. Stuart Bomstein, the general partner of Shoestring, then spoke to the Commission. Bomstein expressed the same concerns as his attorney, and particularly objected to the proposed construction on the coastal bank, something he had apparently tried, unsuccessfully, to do in the past at the same location. The Commission also heard members of the public, some of whom testified in favor of the project and some in opposition to it. The Commission continued the hearing to June 25, 2002.
All the commissioners except T. Walter Wannie attended the continued hearing. Much discussion ensued concerning the delineation of the coastal bank. A scientist from Woods Hole, Dr. Lee Weisher, addressed the issue on behalf of Dockside. Dr. Weisher noted that the proposed building would exist above the 100-year flood plain, consistent with statutory requirements, and he also noted the break in the coastal bank, which he placed at the location of an existing decorative nautical chain fence. He noted the character of the coastal bank as a vertical buffer rather than a sediment source, and concluded that the proposed building would not affect the stability of the coastal bank or adversely affect the aesthetic character of the harbor area. Dr. Weisher discussed various construction techniques which could be employed to ensure the bank’s continued stability and suggested that the specific construction methodology be arrived at prior to the granting of approval. Kurker answered many of the Commissioner’s questions. Importantly, Kurker agreed to reduce the size of the building’s footprint so as to remove it entirely off the coastal bank and agreed to submit construction details for Commission approval. The Commission received additional public comment. Public concerns hinged on fears of a reduction in the width of the channel allowing boats in and out of the harbor area. Several members of the public also expressed concerns about the storage of diying dredge spoils in nearby parking lots, and the reduction in the size of the water sheet that would result from the expansion of the piers. Stuart Bomstein also appeared in further opposition to the project. The Commission noted that the Barnstable Waterways Committee had voted that day to support the project, subject to several conditions. The Commission closed the hearing to further public testimony but left the record open for the inclusion of additional technical information and any written commentary from the public.
On July 19, 2002, Shoestring sent the Commission a letter alerting the commissioners to the commencement of litigation between Shoestring and Dockside concerning the pending conveyance. Shoestring in *281 formed the Commission that it did not consent to any further proceedings on Dockside’s NOI.
On August 6, 2002, the Commission again took up the matter, noting that it received voluminous technical reports after the hearing on June 25th. The Commissioners also noted the apparent start of litigation between Bornstein and Kurker concerning the validity of their sale agreement. The Commission briefly discussed the issue of Kurker’s standing to pursue his application, concluding that if the agreement was valid at the time he filed the application, then Kurker had enough of an interest in the property to pursue his notice of intent. The Commission decided to suspend deliberation on the matter for another week.
On August 13, 2002, the Commission resumed deliberations on Dockside’s NOI. Commissioner Wannie did not attend this meeting. The Commissioners discussed the issue of the definition of the coastal bank. Two weeks later, on August 27, 2002, the Commission again considered the NOI, with Commissioner Wannie in attendance. The Commission deliberated and directed its administrator to prepare a draft order of conditions.
On September 10, 2002, the Commission again considered the NOI and resolved to issue an order of conditions approving Dockside’s NOI. Many findings were read into the record, including the Commission’s finding that the project would not destabilize the coastal bank. As a caveat to this finding, the Commission imposed a requirement that it review the specific construction methods to be employed by the contractors prior to starting work on the building. The Commission also imposed more severe mitigation measures than those agreed to by Dockside initially. The Commission tinkered with the language of the draft order of conditions, making several adjustments. The Chairman called for a vote. The order of conditions was approved with only two Commissioners voting in opposition.
On October 22, 2002, the Commission took up the matter one final time. Kurker, for Dockside, sought to clarify terms in the order of conditions he deemed to be unclear.[4] The Commission issued the final order of conditions on October 31, 2002, with five of the Commissioners endorsing the order.

DISCUSSION

Judicial review under G.L.c. 249, §4, an action in the nature of certiorari, intends to correct “errors in administrative proceedings by means of judicial review where such oversight is not otherwise provided for by statute.” Yerardi’s Moody St. Rest & Lounge, Inc. v. Bd. of Selectmen of Randolph, 19 Mass.App.Ct. 296, 300 (1985). This court limits the scope of review under G.L.c. 249, §4, focusing primarily on rectifying substantial errors of law apparent on the record, and only when those errors adversely affect material rights. Carney v. City of Springfield, 403 Mass. 604, 605 (1995). In a certiorari action, the reviewing court may apply either the “substantial evidence” or the “arbitrary and capricious” standard. Lovequist v. Conservation Comm’n of Dennis, 379 Mass. 7, 17-19 (1979). Under either standard, the plaintiff must demonstrate that the Commission’s decision caused substantial injury or manifest injustice. North Shore Corp. v. Bd. of Selectmen of Topsfield, 322 Mass. 413, 418 (1948).
The nature of the action in question determines the manner in which this court applies the standard of review. Forsyth Sch. for Dental Hygienists v. Bd. of Registration in Dentistry, 404 Mass. 211, 217 (1989). If the plaintiff alleges that the administrative agency issued its decision contrary to the evidence appearing in the administrative record, this court applies the substantial evidence test. New Boston Garden Corp. v. Bd. of Assessors of Boston, 383 Mass. 456, 466-67 (1981). According to the Supreme Judicial Court, substantial evidence is “such evidence as a reasonable mind might accept as adequate to support a conclusion.” Id. at 466. A court applies the “arbitrary and capricious” standard when a plaintiff claims that an agency abused its discretion when making its decision. T.D.J. Dev. Corp. v. Conservation Comm’n of North Andover, 36 Mass.App.Ct. 124, 128 (1994). Under this standard, a reviewing court upholds an agency decision “unless there is no ground which ‘reasonable men might draw proper’ to support it.” Id., quoting Cotter v. Chelsea, 329 Mass. 314, 318 (1952). If the agency acted for reasons extraneous to the prescriptions of the governing regulatory scheme, and are related to an ad hoc agenda, then that agency acted arbitrarily, because the basis for action is not uniform, and therefore unpredictable. Fafard v. Conservation Comm’n of Reading, 41 Mass.App.Ct. 565, 568 (1996).
Shoestring advances five theories in support of its argument that this court should overturn the Commission’s decision. First, Shoestring contends that as the record owner of the property in question, it must consent to the filing of any Notice of Intent filed on behalf of that property. Second, the Commission allegedly erred in determining the location of the top of the property’s coastal bank. Third, Shoestring argues that a procedural irregularity, specifically Commissioner T. Walter Wannie’s absence from a portion of the hearing, dooms the Commission’s decision. Fourth, the Commission improperly conditioned the permit so as to require the submission of, and Commission approval of, additional construction plans which should have been filed prior to the order of conditions’ issuance. Finally, Shoestring believes that the Commission improperly engaged in contract zoning or its equivalent when it approved Dockside’s application. This court addresses each argument in turn.

Shoestring’s Failure to Sign the Notice of Intent

Shoestring claims that the Commission erred by considering the Notice of Intent over Shoestring’s objections. Shoestring asserts that because it still held *282 the record title to the site, its consent amounted to a prerequisite for any Commission action. While Shoestring alleges that Commission regulations require the property owner’s signature on the Notice of Intent in all cases, Shoestring fails to cite any such regulations in support of this proposition, only pointing out that separate signature lines for the owner and applicant appear on the forms provided for the submission of Notices of Intent. This court concludes that Dockside held sufficient interest in the property to pursue its NOI before the Commission, and that nothing on the form or pertaining to the form requires both the locus owner and the project applicant to sign.
Shoestring’s reliance on Batchelder v. Planning Board of Yarmouth, 31 Mass.App.Ct. 104, 107-08 (1991), is misplaced. In Batchelder, the local planning board had in place a regulation requiring that the property owner file the subdivision application. Moreover, the Batchelder Court found the language of the statute dictated the same result. There is no comparable language in the ordinance at hand. Here, the Commission explicitly contemplated situations like the one at hand in which the owner was not the applicant by including separate signature lines on the relevant forms. The Commission discussed this issue, in response to Stuart Bomstein’s repeated efforts to place the issue of standing before the Commission. The Commission concluded that Kurker and Dockside’s interest, at the time they filed the NOI, was sufficient to confer standing, regardless of the institution of court proceedings in the interim.

Delineation of the Coastal Bank

Shoestring alleges that the Commission improperly determined the edge of the coastal bank, and that this error requires reversal. Such an assertion amounts to a claim that the Commission’s decision was not supported by substantial evidence.
As noted above, “substantial evidence consists of such evidence as a reasonable mind might accept as adequate to support a conclusion.” New Boston Garden Corp., 383 Mass. at 466. This court gives “due weight to the experience, technical competence and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it.” G.L.c. 30A, §14(7). On questions of fact and the reasonable inferences drawn therefrom, the court defers to the agency, but the court will examine the entire record and take into account that evidence detracting from the supporting evidence’s weight. New Boston Garden Corp., 383 Mass. at 466. Thus, the substantial evidence standard is one of rational probability, requiring this court to affirm an agency decision unless the evidence “points to no felt or appreciable probability of the conclusion or points to an overwhelming probability of the contrary.” Id Therefore, while according deference to the agency on fact questions , this court may reverse an agency if the “cumulative weight of the evidence tends substantially towards opposite inferences.” Cobble v. Comm’r of Dept. of Social Services, 430 Mass. at 390-91.
Dockside’s application contained a request for permission to construct an outbuilding along the top of the coastal bank. The building’s footprint falls outside the edge of the bank itself, but within the customary 50-foot buffer zone usually enforced between such a bank and any construction. This building is intended to provide miscellaneous services to the boaters using the renovated marina, and Dockside considered it a critical piece of the project.[5] Whether the building is located on the coastal bank affects to a great extent its environmental appropriateness and the likelihood of its approval. Dockside proposed to build right up to the line demarcating the edge of the bank. The parties disagree on this line’s location. This court’s inquiry focuses on the Commission’s methodology in setting the dimensions of the coastal bank and whether or not the evidence suggests an overwhelming probability that the Commission committed an error requiring reversal. The Commission relied heavily on its administrator, Robert Gatewood, as he reviewed Dockside’s interpretation of the coastal bank and its surrounding geography. The relevant state and local regulations place the edge of the coastal bank at its first clearly observable macro-topographical break. A nautical chain supported by stanchions exists at the location relied on by Dockside. The record indicates a histoiy of reliance on this chain as establishing the edge of the coastal bank.[6] The Commission’s administrator noted the bank’s function as a buffer to flood water rather than as a source of sediment. Because of the bank’s role as a buffer, the Commission was not required to consider the effects of construction on sedimentation, but only answer the question of whether the proposed project would adversely affect the stability of the bank. Commission staff considered both state and local methodology, as well as their experience working directly with the DEP, in determining that Dockside’s line of demarcation was the correct one.
Shoestring counters, asserting that the top of the coastal bank actually sits far higher than Dockside indicated. Shoestring relies on recent proceedings before the state Department of Environmental Protection interpreting coastal bank boundaries under the analogous state law. Shoestring cites specifically to a recent case concerning a coastal bank delineation and an administrative law judge’s interpretation of DEP regulations. Those proceedings bring nothing to bear on the matter now before this court. The findings and rulings of an administrative lawjudge construing state law do not bind the hands of a local regulatory body interpreting a local ordinance, and they certainly do not compel this court to impose a retroactive standard upon the local agency.[7]
Under the Barnstable Town Ordinance, the edge of a coastal bank lies at “the first significant break in slope beyond the 100-year storm elevation on a seaward face or elevated landform ...” As Dockside notes, the *283 by-law contains no clarification of the term “significant.” The record indicates that the Commission made some inquiry into the question, and made their decision based on the evidence and their professional staffs review of the evidence, together with their own expertise and knowledge. On this particular, discrete question, this court sees no cause to substitute its own judgment for the Commission’s. See Citizens for Responsible Environmental Management v. Attleboro Mall, Inc., 400 Mass. 658, 675 (1987). This court’s review of the agency record suggests no “overwhelming probability” that the Commission erred in its decision. To the contrary, the Commission engaged in a thoughtful and conscientious process before coming to a decision on the point. According the Commission the deference required by law and precedent, this court concludes that the Commission’s decision, on the delineation of the coastal bank, was supported by substantial evidence.

The Commissioners’ Vote

Shoestring argues that a procedural irregularity dooms the Commission’s decision. Particularly, Shoestring argues that Commissioner T. Walter Wannie failed to attend the June 25th public hearing and, therefore, had no authority to vote on it. Continuing this line of reasoning, Shoestring contends that without Commissioner Wannie’s vote, Dockside’s NOI would have fallen short of the number of votes required to pass the NOI and issue an order of conditions.
This court concludes that Commissioner Wannie was unjustified in voting on the notice of intent because he did not attend the continued hearing on June 25th. Decisions on point unanimously hold that all members of a local regulatory board who are to join its decision must attend the hearing and any continuation of the hearing. Mullin v. Planning Bd. of Brewster, 17 Mass.App.Ct. 139, 141-42 (1983) (quoting McHugh v. Bd. of Zoning Adjustment of Boston, 336 Mass. 682, 684-85 (1958)). See also Sesnovich v. Bd. of Appeals, 313 Mass. 393, 396-97 (1943).
Having concluded that Wannie’s vote cannot be counted, this court next determines whether the order of conditions may stand, as issued, without Wannie’s signature. Five members of the Commission signed the order of conditions, including Commissioner Wannie.[8] Therefore, the order bears four valid signatures. The Commission’s procedure under the wetlands protection ordinance requires that no particular number of Commissioners vote on a particular NOI or sign an order of conditions. Thus, the case would seem to fall under the common law rule that, “(i]n the absence of statutory restriction the general rule is that the majority of a council or board is a quorum and a majority of the quorum can act.” McElderry v. Planning Board of Nantucket, 431 Mass. 722, 725 (2000), quoting Merrill v. Lowell 236 Mass. 463, 467 (1920). The Wetlands Protection Act, G.L.c. 131, §40 governs the Commission’s analogous inquiry under state law. Section 40 requires the Commission to affix a majority of its members’ signatures to any order of conditions issued. For a board of seven, four members must sign. This court is mindful of the Supreme Judicial Court’s imprecation that when trying to harmonize a highly specific requirement in a statute with another less-specific statute or ordinance, that “some measure of consistency is desirable between the provisions of the two statutes on the voting requirements necessary to decide applications for variances or special permits ...” McElderry, 431 Mass. at 727. Particularly where the Commission conducts one hearing under two separate laws, and issues one order of conditions afterwards, to allow separate voting and endorsement parameters would result in the type of “anomalous situation” frowned upon in our jurisprudence. See Id. Therefore, this court concludes that even under the local ordinance an order of conditions must bear the signatures of a majority of the commissioners, in this case, again, four.[9] The order of conditions stands.

The Lack of Construction Protocol and Landscaping Plans

Shoestring next contends that the Commission erred by issuing an order of conditions permitting Dockside to defer submission of construction protocols and landscaping plans. Shoestring looks to the language in section 14 of the Barnstable wetlands protection ordinance requiring projects to have “no adverse impact on the stability of the coastal bank” as requiring the Commission to determine, prior to issuing an order of conditions, that the coastal bank’s stability would not be impacted by Dockside’s project.[10] Following this line of reasoning, Shoestring claims that without a landscaping plan or construction protocols, the Commission had no basis for finding in the order of conditions that the project would not adversely affect the bank’s stability.
Shoestring correctly cites to Tebo v. Board of Appeals of Shrewsbury, 22 Mass.App.Ct. 618, 624 (1986), for the rule that “a permit granting authority . . . may not delegate to another board, or reserve to itself for future decision, the determination of an issue of substance, i.e. one central to the matter before the permit granting authority.” See also Board of Appeals of Hanover v. Housing Appeals Committee, 363 Mass. 339, 374-75 (1973), Weld v. Board of Appeals of Gloucester, 345 Mass. 376, 378 (1963).
Here, the Commission attempts to finesse the issue when it makes an explicit finding that the project would have no adverse impact on the bank, but at the same time expressly defers the submission of detailed construction and landscaping protocols. In the absence of any information speaking to this specific project, the Commission’s finding on this point is better stated as a finding only that it is indeed possible to construct the building without destabilizing the coastal bank. In other words, the Commission’s finding that the project was acceptable, in the absence of construction plans, was manifestly unsupported by *284 the substantial evidence in the record. This court must remand the matter to the Commission for a hearing and findings on this discrete point and no other.

Contract Zoning

The plaintiffs final argument centers on the concept of contract zoning. Shoestring argues that the Commission, by imposing mitigation requirements and seeking to ensure the project would result in improved water quality, actually engaged in impermissible contract zoning. This court disagrees with Shoestring’s interpretation of our jurisprudence on this issue, and finds that the Commission’s negotiations with Dockside to ensure the redounding of environmental benefits to the surrounding harbor legally quite tenable.
Courts reviewing zoning decisions employ standards analogous to the “substantial evidence” test and the “arbitrary and capricious” standard used here, and to that extent their reasoning may extend to cases like this one. See Johnson v. Edgartown, 425 Mass. 117, 121 (1997) (zoning decisions upheld unless arbitrary and unreasonable); Crall v. Leominster, 362 Mass. 95, 101 (1972) (zoning bylaw presumed valid as long as it is “fairly debatable”). Shoestring’s concept of contract zoning seems to hinge on an obsolete doctrine predicated upon the Supreme Judicial Court’s decision in Sylvania Elec. Prods, Inc. v. Newton, 344 Mass. 428, 434 (1962), in which that court noted that a developer’s promise of an “extraneous consideration” potentially impeached the integrity of a vote to rezone a particular locus. The Massachusetts Appeals Court gave continued vitality to the doctrine in the decisions of McLean Hosp. Corp. v. Belmont, 56 Mass.App.Ct. 540, 546-47 (2002) (noting that zoning enactment susceptible to challenge on grounds of extraneous consideration), and Rando v. North Attleborough, 44 Mass.App.Ct. 603, 608-09 (1998) (no extraneous consideration where voluntary promise to subsidize public need arising because of project). A recent decision in this Commonwealth reconsiders that doctrine, and states in no uncertain terms that there is “no persuasive authority for the proposition that an otherwise valid zoning enactment is invalid if it is in any way prompted or encouraged by a public benefit voluntarily offered.” Durand v. IDC Bellingham, LLC, 440 Mass. 45, 57 (2003).[11]
Here, Dockside promised several environmental benefits would result if the project were approved, notably improved water quality, improved handling of boating waste and substantial dredging of the harbor. The court in Durand concluded that the proper inquiiy when reviewing a zoning enactment is whether it violates state law or constitutional provisions, is arbitrary or unreasonable, or is substantially unrelated to the public health, safety, or general welfare. 440 Mass, at 57. Adapting that principle to the facts in this case, this court concludes that in the absence of any other infirmity, the exchange of environmental benefits for permission to build provides no basis for invalidating any Commission action.

ORDER

For the foregoing reasons, it is hereby ORDERED that Shoestring’s motion for judgment on the pleadings be DENIED, without prejudice. Further, it is ORDERED that the matter be REMANDED to the Barnstable Conservation Commission for further public hearing on the single issue of construction and landscaping protocols and the stability of the coastal bank. Upon the conclusion of proceedings, the Commission shall transmit its findings to this court, and the parties may, if appropriate, renew the motion and supplement their filings on the sole question remanded.[12]

 The defendant Barnstable Conservation Commission filed the administrative record and the supplement thereto, but filed no opposition to Shoestring’s motion, leaving it to the parties in interest to litigate the issues, a position often assumed by local boards.

 Only Robert Braman’s signature appears on the NOI.

 Additionally, Kurker sought to increase the total square footage of dock permitted within the reconfiguration zone. The Commission, rightly, declined this request because it would constitute a material alteration to the plan triggering new hearings and public commentary.

 Dockside also apparently intends to have a resident caretaker at the premises, apparently with quarters in the new building.

 The record also indicates that numerous past filings from various parties, Including the plaintiff in this case, also looked to the same point as delineating the break.

 Shoestring erroneously relies on Dubuque v. Conservation Comm'n of Barnstable, 58 Mass.App.Ct. 824, n.3 (2003), in support of its claim that the local ordinance must be interpreted to be more restrictive than the state law concerning this issue. That case concerns the Commission’s authority to regulate particular interests enumerated in the town bylaw but not in the state law.

 Albert Barbour and James Lane did not sign the order.

 Shoestring’s assertion that G.L.c. 131, §40 requires a majority “vote” is erroneous. The statute requires a majority of commissioners to sign the order of conditions but says nothing about voting processes. The results of straw polls or other votes are therefore irrelevant to the validity of an approved order of conditions because each commissioner’s decision to affix his signature to the order of conditions determines the outcome here.

 Dockside revised its plans at the last moment to take the building footprint just barely outside the bank’s edge. Nonetheless, the building still sits within the adjacent buffer zone. Therefore, the Commission should still make a supportable finding that the construction will not destabilize the coastal bank itself.

 Contrary to Dockside’s assertion, the Supreme Judicial Court in Durand did not “approve” of contract zoning. The decision simply focuses the inquiry of the court where it belongs, on the merits of the decision, and away from superfluous matters outside the traditional scope of administrative law principles. 440 Mass. at 56-58.

 Given the ongoing title dispute between Shoestring and Dockside, the Court’s Order intentionally omits time limitations on remand. The Commission is left to conduct proceedings in a reasonably timely manner.