MARK ALFORD & others[1] vs. BOSTON ZONING COMMISSION & others.[2]

No. 12-P-1579.

Suffolk. May 8, 2013. - October 9, 2013.

Present: MILKEY, CARHART, & SULLIVAN, JJ.

*Boston. Zoning,* Amendment of by-law or ordinance, Appeal, Educational use, Hearing, Judicial review. *Quasi-Judicial Tribunal. Administrative Law,* Adjudicatory proceeding, Conflict of interest, Hearing. *Practice, Civil,* Zoning appeal. *Constitutional Law,* Right to hearing.

This court concluded that art. 29 of the Massachusetts Declaration of Rights did not apply to the institutional master plan process under the Boston zoning code, where that process is not quasi adjudicatory; accordingly, in a civil action, a Superior Court judge properly entered summary judgment in favor of the defendants in an action brought by the plaintiff abutters challenging the approval of a college's institutional master plan. [363-369]

In a civil action brought by plaintiff abutters challenging the approval of a college's institutional master plan under the Boston zoning code, a Superior Court judge properly entered summary judgment in favor of the defendants on the plaintiffs' unsubstantiated claim that a zoning commission member's bias violated their rights under art. 29 of the Massachusetts Declaration of Rights [369]; further, the plaintiffs' claim that the approval process took place outside of public hearings lacked merit [369].

In a civil action challenging the approval of a college's institutional master plan under the Boston zoning code, the plaintiffs failed to show that the decision of the Boston Redevelopment Authority (authority) was arbitrary and capricious, or that the manner in which the authority conducted its proceedings was reviewable under St. 1956, c. 665, the enabling act. [369-370]

In a civil action challenging the approval of a college's institutional master plan under the Boston zoning code, there was no abuse of discretion in the denial of the plaintiffs' request under Mass.R.Civ.P. 56(f) to conduct additional discovery. [370-371]

CIVIL ACTION commenced in the Superior Court Department on July 9, 2009.

[1] Patrick Galvin and Gloria Simmons.

[2] Boston Redevelopment Authority, Trustees of Boston College, and Boston College Task Force.

The case was heard by *Frances A. McIntyre*, J., on a motion for summary judgment.

*Orestes G. Brown* for the plaintiffs.

*Michael K. Murray* for Trustees of Boston College.

*Adam Cederbaum* for Boston Zoning Commission.

*Denise A. Chicoine* for Boston Redevelopment Authority.

CARHART, J. The plaintiffs, who own property that abuts property owned by Boston College (BC), appeal from summary judgment entered by a Superior Court judge, who determined that art. 29 of the Massachusetts Declaration of Rights does not apply to review and approval by the Boston zoning commission (zoning commission) and the Boston Redevelopment Authority (BRA) of Boston College's Institutional Master Plan (IMP). The judge also ruled that the approval of the IMP was not arbitrary or capricious, and that the plaintiffs' request to defer summary judgment pursuant to Mass.R.Civ.P. 56(f), 365 Mass. 824 (1974), was without merit. We affirm.

*Background.* In the spring of 2003, BC embarked on a strategic planning process to redevelop its Chestnut Hill and Brighton campuses. In November, 2003, the Catholic Archdiocese of Boston announced its intention to sell sixty-five acres of property located in Brighton. In May, 2004, BC purchased approximately forty-three of those acres and, in subsequent transactions in 2006 and 2007, purchased the remaining acreage. After BC finalized the purchases, it hired a campus architecture and planning firm to help develop a long-term comprehensive campus plan. Among BC's main institutional objectives were to develop more "academic, residential and co-curricular facilities." The plan was projected to cost $1.6 billion and span ten years.

Under art. 80D of the Boston zoning code (art. 80D), when educational or health care institutions[3] with more than 150,000 square feet seek to expand by more than 20,000 gross square feet, they must file for review an IMP with the BRA. See Bobrowski, Massachusetts Land Use and Planning Law § 13.06[E][1] (3d ed. 2011). The purpose of the IMP review

---

[3]We note that the term "institutional uses" means college, university, hospital, nursing home, or convalescent home uses. Boston Zoning Code, art. 2A.

"is to provide for the well-planned development of Institutional Uses in order to enhance their public service and economic development role in surrounding neighborhoods." Art. 80D, § 80D-1. To initiate the IMP review process, the institution must file an IMP notification form with the BRA, which describes the plan's mission, objectives, projects, and anticipated impacts on the community. Art. 80D, § 80D-5.2(b). Beginning in 2006, BC began conducting a series of community meetings with the Boston College Task Force (task force),[4] elected officials, and neighbors regarding its expansion plans. On December 5, 2007, after two years of community meetings, BC submitted its IMP notification form to the BRA.

The BRA, pursuant to art. 80D, § 80D-5, published notice of the IMP notification form, sought public comments,[5] and held a public hearing. On February 21, 2008, the BRA issued a "Scoping Determination" to BC, which identified additional information the IMP must include. See art. 80D, § 80D-5.3. The BRA directed BC to include data depicting past and future student body projections and data on its current student body housing (both on and off campus). Additionally, to mitigate potential negative impacts on surrounding residential areas, the BRA required alternative configurations for proposed athletic facilities and more detailed transportation and parking plans. Further, the BRA directed BC to increase on-campus housing to alleviate concerns from surrounding communities about the off-campus housing of BC students, to explore ways the city of Boston (Boston) can leverage BC's planned investments to benefit the Boston economy, and to create plans to enable the surrounding communities to benefit from the IMP. After receiving the scoping determination, BC continued to work with the task force, community members, and Boston city government.

---

[4] A task force such as this one is a group appointed by the mayor of Boston to act as a liaison between an institution and the community, and to facilitate dialogue between the public and the BRA.

[5] Comments were received from Boston city council members; members of the House of Representatives; the Boston environment department; the Boston transportation department; the city of Newton; the Secretary of State; the Boston Water and Sewer Commission; civic organizations; and private individuals.

On June 20, 2008, BC filed its IMP with the BRA. The BRA published notice and sought public comments regarding the IMP. The IMP incorporated changes sought from the scoping determination and from public comments. Among the changes, BC proposed to purchase and convert a building at 2000 Commonwealth Avenue, Boston, into undergraduate housing, which would house 560 students. BC notified the BRA once it purchased 2000 Commonwealth Avenue, and the BRA extended the public comment period by an additional two weeks. In response to public comments, BC agreed to reduce the scope of certain projects. From December 3, 2008, to January 29, 2009, the BRA held public meetings, received comments, and worked with BC to alter the IMP.

On January 29, 2009, the BRA voted to approve the IMP and send it to the zoning commission for approval. On April 15, 2009, the zoning commission published notice that it had received the IMP from the BRA. At the subsequent May 6, 2009, public hearing, the IMP was met with favor and opposition. There were also presentations regarding the IMP's community review process, transportation aspects, and economic benefits. At the conclusion of the hearing, the zoning commission voted to approve the IMP.

The zoning commission then forwarded the IMP to the mayor of Boston (mayor) for his approval. On May 13, 2009, the mayor returned the IMP to the zoning commission unsigned, requesting an amendment. On June 10, 2009, the zoning commission held a public hearing on the mayor's amendment. The zoning commission voted to adopt the amendment that day and returned it to the mayor, who then signed the IMP.

The IMP includes the following projects: 790 additional beds for on-campus students; a 285,000 square foot university center that will provide space for student organizations, dining accommodations, and conference rooms; a 350-space addition to an existing garage; and a 500-space parking facility. Under the IMP, and in acquiescence to BRA directives, BC also must notify the mayor's office of its property purchases in Boston exceeding $5 million and propose plans to eliminate off-campus housing in the Allston and Brighton sections of Boston. Additionally, the IMP is expected to produce $1 billion in planned

construction projects, approximately 12,243 jobs, $737 million in labor income for community residents, and a ten-year economic impact of approximately $1.57 billion.

*Procedural history.* On July 9, 2009, the plaintiffs filed a complaint in Superior Court against the zoning commission, the BRA, and the task force to enjoin the IMP's implementation. On November 9, 2009, BC moved to intervene as a defendant, which was allowed. On January 25, 2010, the plaintiffs moved to amend their complaint to add additional claims, including violation of art. 29 of the Massachusetts Declaration of Rights (art. 29).

On June 29, 2010, a Superior Court judge denied most of the motion to amend the complaint, but allowed the plaintiffs to add the art. 29 claim. The judge determined that the IMP approval was the product of " 'adjudicatory proceedings' involving 'particular persons, their business or property, and their relation to a particular transaction [rather than questions of] . . . governmental policy' . . . . See *Mullin* v. *Planning Board of Brewster*, 17 Mass. App. Ct. 139, 142-143 (1983)."[6]

On July 29, 2011, the defendants moved for summary judgment. The plaintiffs subsequently moved to stay summary judgment pursuant to rule 56(f). On February 27, 2012, a second Superior Court judge (summary judgment judge) allowed the defendants' summary judgment motion, and denied the plaintiffs' motion to stay summary judgment, stating, "[i]t appears to this court that the plaintiffs are falling back on Rule 56(f) in order to extend the litigation and frustrate resolution of this land use matter, which the court cannot allow to occur."

Regarding the art. 29 claim, the summary judgment judge determined that the IMP approval process was a legislative act and not an adjudicatory proceeding, and stated that she was not bound by the previous judge's ruling on this claim, as that ruling pertained to the plaintiffs' motion to amend their complaint. The plaintiffs timely appealed.

*Discussion.* 1. *Applicability of art. 29.* The plaintiffs argue that the summary judgment judge erred in concluding that art.

---

[6]A single justice of this court denied, without comment, the defendants' motion to review the judge's decision allowing the plaintiffs to add the art. 29 claim.

29 does not apply to the approval of BC's IMP.[7] They contend that the zoning commission and the BRA acted as adjudicatory or quasi adjudicatory bodies when they approved the IMP under art. 80 of the Boston zoning code. Further, the plaintiffs argue that IMPs are not a form of zoning amendment; rather, they are akin to special permits and variances. From that premise, the plaintiffs maintain that the IMP approval process, which implicated art. 29, was infected with bias and ex parte communications. They allege that (1) a zoning commission member was a lobbyist hired by BC to work on property issues, master planning, and a campus master plan during its IMP approval process and that (2) the BRA, the zoning commission, and BC communicated outside the public meeting process to reach an agreement to approve the IMP.

We review de novo the allowance of the defendants' motion for summary judgment, drawing all inferences in the light most favorable to the plaintiffs. *Attorney Gen.* v. *Bailey*, 386 Mass. 367, 370-371, cert. denied, 459 U.S. 970 (1982).

Article 29 of the Massachusetts Declaration of Rights states:

> "[i]t is essential to the preservation of the rights of every individual, his life, liberty, property, and character, that there be an impartial interpretation of the laws, and administration of justice. It is the right of every citizen to be tried by judges as free, impartial and independent as the lot of humanity will admit."

"Article 29 extends beyond judges 'to all persons authorized to decide the rights of litigants.' " *Police Commr. of Boston* v. *Municipal Ct. of the W. Roxbury Dist.*, 368 Mass. 501, 507 (1975), quoting from *Beauregard* v. *Dailey*, 294 Mass. 315, 324 (1936). The issue, then, is whether the IMP approval process should be considered adjudicatory. The plaintiffs rely on *Mullin* v. *Planning Bd. of Brewster*, 17 Mass. App. Ct. 139, 142-143 (1983), for the proposition that art. 29 extends to the IMP approval process under the Boston zoning code because it is essentially adjudicatory in nature.

---

[7] We reject the plaintiffs' argument that the law of the case doctrine precluded the summary judgment judge from determining that the IMP approval process was not adjudicatory or quasi adjudicatory in nature. See *I.S.K. Con of New England, Inc.* v. *Boston*, 19 Mass. App. Ct. 327, 329-330 (1985).

In *Mullin,* we held that the Brewster planning board acted in a quasi adjudicatory manner in granting a special permit for a planned unit development,[8] citing the many procedural requirements involved with special permits and explaining that "an adjudicatory proceeding is one involving 'particular persons, their business or property, and their relation to a particular transaction [rather than a question involving] . . . governmental policy.' " *Id.,* quoting from *Cast Iron Soil Pipe Inst.* v. *State Examrs. of Plumbers & Gas Fitters,* 8 Mass. App. Ct. 575, 586 (1979). Here, by contrast, we deal with a governmental policy specifically aimed at facilitating land use development for educational and health care purposes.

As the Commonwealth's capital and its largest city, Boston encounters unique land use problems that engenders special legislation. See *Opinion of the Justices,* 341 Mass. 760, 782-783 (1960). In 1956, the Legislature enacted "An Act Authorizing the City of Boston to Limit Buildings According to Their Use or Construction to Specified Districts" (enabling act). St. 1956, c. 665. The enabling act is separate and distinct from the Statewide zoning act (G. L. c. 40A). *Emerson College* v. *Boston,* 393 Mass. 303, 309 (1984). Section 2 of the enabling act authorizes the zoning commission to adopt and amend zoning regulations "[f]or the purpose of promoting the health, safety, convenience, morals or welfare of its inhabitants." Likewise, the BRA may approve an IMP only if (a) it conforms to the provisions of art. 80 of the Boston zoning code, (b) conforms to the general planning objectives of Boston as a whole, and (c) "on balance, nothing in the [IMP] will be injurious to the neighborhood or otherwise detrimental to the public welfare, weighing all the benefits and burdens." Art. 80D, § 80D-4. The standards and procedures required to amend the Boston zoning

---

[8] " 'Planned unit development' means a mixed use development on a plot of land containing a minimum of the lesser of sixty thousand square feet or five times the minimum lot size of the zoning district, but of such larger size as an ordinance or by-law may specify, in which a mixture of residential, open space, commercial, industrial or other uses and a variety of building types are determined to be sufficiently advantageous to render it appropriate to grant special permission to depart from the normal requirements of the district to the extent authorized by the ordinance or by-law." G. L. c. 40A, § 9, as amended by St. 2006, c. 205, § 8.

code and approve IMPs are the same, and implicate long-term governmental policy questions. As such, they are distinct from the standards and procedures for granting variances[9] or special permits.[10] See generally *Woodland Estates, Inc.* v. *Building Inspector of Methuen*, 4 Mass. App. Ct. 757 (1976); *McLean Hosp. Corp.* v. *Belmont*, 56 Mass. App. Ct. 540 (2002).

Additionally, the purpose of the IMP review process:

> "is to provide for the well-planned development of Institutional Uses in order to enhance their public service and economic development role in the surrounding neighborhoods. [IMP] Review recognizes that Institutional Uses need to expand and renovate their facilities more frequently than do other uses, and that the cumulative effects of incremental expansion may be greater than, or different from, the effects of each project individually. To assess these cumulative impacts and determine appropriate community benefits, [IMP] Review examines the combined impacts of an Institution's overall development program and affords the public the opportunity for review and comment."

Art. 80D, § 80D-1.

Here, BC proposed a vast, long-term renovation project of its campus, which will have an economic impact of approximately $1.57 billion, and will undoubtedly have a substantial effect on surrounding neighborhoods and communities. In order to ensure that the development is harmonious with the standard set out in section 2 of the enabling act, art. 80D sets forth an extensive

---

[9]Statute 1956, c. 665, § 9, provides that the board of appeal may grant a variance "where, owing to conditions especially affecting such a parcel or such building, but not affecting generally the zoning district in which it is located, a literal enforcement of the provisions of such zoning regulation would involve substantial hardship to the appellant."

[10]Article 6, § 6-3, of the Boston zoning code (as amended on May 9, 1996) provides that the board of appeal shall grant a permit for a conditional use "only if it finds that all of the following conditions are met: (a) the specific site is an appropriate location for such use . . . ; (b) the use will not adversely affect the neighborhood; (c) there will be no serious hazard to vehicles or pedestrians from the use; (d) no nuisance will be created by the use; [and] (e) adequate and appropriate facilities will be provided for the proper operation of the use."

approval process so that Boston, its administrative bodies, and residents can fully gauge the project's impact and provide input.

Despite the important policy considerations at hand, the plaintiffs argue that BC's IMP is similar to the special permit process in *Mullin, supra.* We disagree. IMPs were created specifically to address the shortcomings that the special permit process posed to health care and educational institutions. Prior to the adoption of IMPs, these institutions were considered conditional uses and had to seek individual permits from the Boston board of appeal for expansions or changes of use. See Barr, Boston Zoning: A Lawyer's Handbook § 7.3.2(c) (Mass. Cont. Legal Educ. 5th ed. 2013). "A conditional use permit application can address only one project (or part of one) at a time, without regard to future development or the combined effects of multiple projects." Bobrowski, Massachusetts Land Use and Planning Law § 13.06[E][1], at 465 n.105. Thus, as these types of institutions sought the development of multiple projects over noncontiguous parcels of land, this land use development process burdened neighborhoods and institutions alike. See, e.g., *Woodland Estates, Inc.,* 4 Mass. App. Ct. at 759 (zoning amendment creating hospital district eliminated need for hospital to repeatedly obtain zoning variances). Accordingly, IMPs are intentionally distinct from the special permit in *Mullin.* And, contrary to the plaintiffs' argument, zoning amendments may be devised to address a particular property or parcel of land where there is a justifiable public need. See generally *Woodland Estates Inc., supra* at 760-762; *McLean Hosp. Corp., supra* at 544-548.

In determining whether a governmental body acts quasi judicially, we also consider the nature of the governing standard, and whether the proceeding "consist[s] primarily of unsworn statements by interested persons advocating or disapproving the proposed new policy, as contrasted with sworn testimony by witnesses subject to cross-examination in a hearing preceded by specific charges and followed by the adoption of formal findings of fact." *Pronghorn, Inc.* v. *Licensing Bd. of Peabody,* 13 Mass. App. Ct. 70, 73 (1982). See *School Comm. of Hudson* v. *Board of Educ.,* 448 Mass. 565, 576-578 (2007) (board's decision to grant charter to school was not made in quasi judicial proceeding, where public hearing served only to provide for

public comment on final application); *Alliance to Protect Nantucket Sound, Inc.* v. *Energy Facilities Siting Bd.*, 457 Mass. 663, 691 (2010).

In *Pronghorn*, we held that a Peabody licensing board hearing, which focused on closing hours for restaurants based on public safety considerations, was legislative rather than quasi judicial in nature, with "[n]o one factor by itself lead[ing] to that conclusion." *Pronghorn, Inc.*, 13 Mass. App. Ct. at 72. Similarly, in *Cast Iron Soil Pipe Inst.*, 8 Mass. App. Ct. at 586, we concluded that two amendments to the State plumbing code by the board of State examiners of plumbers and gas fitters were a legislative process that did not implicate the procedural protections
afforded to adjudicatory proceedings under G. L. c. 30A, § 1. We reasoned that

> "a requirement that the rules and regulations promote the public health, safety, and welfare . . . suggests a political question, one of governmental policy to be decided predominantly upon legislative facts rather than upon adjudicative facts involving particular persons, their business or property, and their relation to a particular transaction."

*Cast Iron Soil Pipe Inst., supra.*

The IMP approval process here consisted "primarily of unsworn statements by interested persons advocating or disapproving the proposed . . . policy." *Pronghorn, Inc.*, 13 Mass. App. Ct. at 73. Comments on the proposed expansion came from elected officials, government agencies, civic organizations, and private individuals. Further, "[a]n adjudicatory or quasi judicial format would not have been well adapted functionally to the type of determination" that the zoning commission was to make. *Ibid.* A substantial overlap of responsibilities between the zoning commission and BRA renders an adjudicatory format impracticable.[11] Moreover, whether to amend the Boston zoning code is a decision based on "preference," and the inquiry would not be furthered by the right to cross-examination. *O'Neill* v.

---

[11]For example, "the BRA provides staff support to the [zoning commission]. . . . [T]he BRA provides the [zoning commission's] secretary and its zoning adviser." Barr, Boston Zoning: A Lawyer's Handbook § 3.5.2, at 3-7.

*Nantucket,* 711 F.2d 469, 471-472 (1st Cir. 1983). Accordingly, we conclude that the IMP approval process under the Boston zoning code is not quasi adjudicatory, and that summary judgment for the defendants was properly entered on that basis.

2. *Specific art. 29 claims.* The plaintiffs allege that the approval process was infected with bias because Lynda Bernard, a zoning commission member, was a paid lobbyist working on property issues, master planning, and a campus master plan for BC during the relevant time period. The plaintiffs frame the issue solely in terms of a violation of art. 29. They do not claim a violation of the conflict of interest law (G. L. c. 268A).

Without addressing whether Bernard's financial interest in BC's campus planning during the IMP approval process raises potential appearance problems, we conclude that the bias described by the plaintiffs does not establish a constitutional violation. Bernard submitted an affidavit averring that she resigned from the zoning commission before it received the IMP and that she did not participate in any proceedings, hearings, or discussions with any zoning commission members regarding BC's IMP. The plaintiffs have not provided evidence to rebut Bernard's affidavit, nor have the plaintiffs alleged that any of the other zoning commission members had an interest in BC's IMP or discussed the IMP with Bernard. Without more, the plaintiffs' claim is tenuous and unsubstantiated, and it does not establish a violation of art. 29. See *Varga* v. *Board of Registration of Chiropractors,* 411 Mass. 302, 304-308 (1991).

The plaintiffs also allege that the process was largely the result of communications between the BRA, the zoning commission, the mayor's office, and BC that occurred outside the public hearing process and without the opportunity for rebuttal by the plaintiffs. The plaintiffs, however, point to no requirement that the public hearings be conducted on the record as adversarial proceedings. See, e.g., *School Comm. of Hudson,* 448 Mass. at 576-578; *Alliance to Protect Nantucket Sound, Inc.,* 457 Mass. at 691. Further, the plaintiffs have not indicated how the IMP approval process prohibited those communications. Therefore, we conclude that this argument is without merit.

3. *Rational basis for the IMP.* The plaintiffs further argue that, apart from the art. 29 claims, the approval of BC's IMP

was arbitrary and capricious. "[A] party attacking a zoning amendment has a heavy burden, one requiring that he 'prove by a preponderance of the evidence that the zoning regulation is arbitrary and unreasonable, or substantially unrelated to the public health, safety, morals, or general welfare.' " *McLean Hosp. Corp.*, 56 Mass. App. Ct. at 547, quoting from *Johnson* v. *Edgartown*, 425 Mass. 117, 121 (1997).

Boston has made a determination that when a health care or educational institution seeks large-scale expansion over noncontiguous parcels of land, instead of requiring it to obtain variances or special permits, which are often costly and time-consuming, see, e.g., *Woodland Estates, Inc.*, 4 Mass. App. Ct. at 759, it may request an amendment to the zoning code to allow for that development. As previously explained, the process by which an amendment to the zoning code is approved requires communication and input from multiple sectors of State and local government and private parties in an effort to ensure that the amendment comports to the standards of art. 80D, § 80D-4, and section 2 of the enabling act. Based on the record before us, we are not persuaded that the approval of BC's IMP was arbitrary or capricious.

The plaintiffs additionally argue that the BRA's approval of the IMP was binding on the zoning commission and, therefore, subject to de novo review as an integral part of the plaintiffs' appeal from the zoning commission's final decision. The enabling act establishes that the BRA's approval is a prerequisite to the zoning commission's consideration of the IMP, but it does not bind the zoning commission's decision to "adopt," "reject," or "adopt . . . in substantial accord" a recommendation from the BRA. St. 1956, c. 665, § 3. Accordingly, the plaintiffs have failed to show that the BRA's decision was arbitrary or capricious, or that the manner in which the BRA conducted its proceedings is reviewable under the enabling act.

4. *Mass.R.Civ.P. 56(f)*. Finally, the plaintiffs argue that their Mass.R.Civ.P. 56(f) request to conduct additional discovery, which the plaintiffs contend is relevant to their specific claims under art. 29, should have been allowed. The plaintiffs' claims under art. 29, however, are premised on a determination that the IMP approval process is quasi adjudicatory in nature, which it

is not. Consequently, the additional material sought by the plaintiffs would not have been relevant to the decision whether to grant summary judgment. See, e.g., *Commonwealth* v. *Fall River Motor Sales, Inc.*, 409 Mass. 302, 307-309 (1991). We therefore conclude that there was no abuse of discretion in the denial of the plaintiffs' rule 56(f) request.

*Judgment affirmed.*