SCHOOL COMMITTEE OF HUDSON & others[1] *vs.* BOARD OF
EDUCATION & others.[2]

Middlesex. February 5, 2007. - March 22, 2007.

Present: GREANEY, IRELAND, SPINA, & CORDY, JJ.

*Practice, Civil,* Judgment on the pleadings, Relief in the nature of certiorari,
Declaratory proceeding. *Declaratory Relief. Education Reform Act. Board
of Education. Commonwealth,* Education. *Education,* Charter school. *Administrative Law,* Adjudicatory proceeding, Agency, Judicial review. *School
and School Committee,* Standing to challenge validity of statute.

Discussion of the pertinent statutory provisions and regulations governing the
establishment of charter schools in the Commonwealth. [567-573]
A Superior Court judge did not err in concluding that three local school committees had no right to judicial review of a decision of the Board of
Education (board) to grant a school a charter under G. L. c. 71, § 89, to
operate a Commonwealth charter school, where the decision of the board
was not made in the context of a judicial or quasi-judicial proceeding, as
required for certiorari review under G. L. c. 249, § 4 [575-577], or in the
context of an adjudicatory proceeding, as required for judicial review
under G. L. c. 30A, § 14 [577-578]; and where the plaintiffs lacked standing to bring a complaint for declaratory relief under G. L. c. 231A, given
the absence of any indication that the Legislature intended that school
committees be able to seek judicial review of the board's decision to grant
a charter [578-584].

CIVIL ACTION commenced in the Superior Court Department on
March 25, 2004.

The case was heard by *Stephen E. Neel,* J., on motions for
judgment on the pleadings.

The Supreme Judicial Court granted an application for direct
appellate review.

*Kay H. Hodge* (*Geoffrey R. Bok* with her) for the plaintiffs.

*Jane L. Willoughby,* Assistant Attorney General, for Board of
Education & another.

_____

[1]School committee of Marlborough and school committee of Maynard.

[2]Commissioner of Education (commissioner), and the Advanced Math and
Science Academy Charter School (AMSA).

*Lawrence G. Green (Susan E. Stenger & Anatoly Darov* with him) for Advanced Math and Science Academy Charter School.

The following submitted briefs for amici curiae:

*Stephen J. Finnegan & Michael J. Long* for Massachusetts Association of School Committees & another.

*John D. Hanify, Kathleen E. Cross, & Jonathan D. H. Lamb* for Massachusetts Charter Public School Association.

GREANEY, J. On February 24, 2004, the defendant Board of Education (board) granted the defendant Advanced Math and Science Academy Charter School (AMSA), a charter under G. L. c. 71, § 89, to operate a "Commonwealth charter school."[3] AMSA would draw its students from the towns of Hudson, Marlborough, Maynard, and Clinton. Pursuant to G. L. c. 71, § 89 (g),[4] a copy of AMSA's "final application" for a charter had been sent to the school committees of these towns for their review and comment. Each of the four school committees submitted written comments, some extensive and detailed, in opposition to the final application. After the approval of a charter for AMSA, three of the four school committees, the school committees of Hudson, Marlborough, and Maynard (plaintiffs), commenced an action in the Superior Court against the board, the Commissioner of Education (commissioner), and AMSA seeking judicial review of the board's decision to grant AMSA a charter (1) through certiorari under G. L. c. 249, § 4; (2) under the Administrative Procedures Act, G. L. c. 30A; or (3) by means of a declaratory judgment under G. L. c. 231A. On cross motions for judgment on

---

[3]There are two types of charter schools: Commonwealth charter schools and Horace Mann charter schools. See G. L. c. 71, § 89 (a) (defining Commonwealth charter schools), (b) (defining Horace Mann charter schools). Some of their differences will be explained later in this opinion.

[4]General Laws c. 71, § 89 (g), provides:

"An application submitted for the establishment of a commonwealth charter school shall: (1) be submitted to the board of education for approval pursuant to this section; and (2) be filed with the local school committee for the school district in which the charter school is to be located. Before final approval to establish a commonwealth charter school the board of education shall hold a public hearing on said applications, and solicit and review comments on the application from the local school committee for the school district in which said charter school is to be located."

the pleadings, a Superior Court judge concluded that the plaintiffs had no right to judicial review under these statutes, and final judgment entered in favor of the defendants. The plaintiffs appealed, and we granted their application for direct appellate review. We affirm the judgment.

1. To establish context, we first set out the pertinent statutory provisions and regulations. As part of the Education Reform Act of 1993, the Legislature enacted G. L. c. 71, § 89, the charter school statute. See St. 1993, c. 71, § 55. As previously noted, the statute provides for two types of charter schools: Commonwealth charter schools and Horace Mann charter schools. G. L. c. 71, § 89 (*a*) and (*b*). Both types of charter schools are considered public schools, see *id.*, and, generally speaking, are established to encourage innovative educational practices. *Id.* at § 89 (*d*).[5]

Commonwealth charter schools operate under a charter granted by the board, are managed by a board of trustees ("deemed to be public agents authorized by the [C]ommonwealth to supervise and control the charter school"), and operate independently of the local school committees for the districts in which the charter schools are located. *Id.* at § 89 (*a*). The charter under which a Horace Mann charter school operates is also granted by the board, but must be "approved by the local school committee in which the school is located and by the local collective bargaining agent [teachers' union]." *Id.* at § 89 (*b*). In addition, Horace Mann charter schools are operated and managed by boards of trustees that are independent of local school committees. *Id.* A member of the school committee may serve on the board of trustees. *Id.*

The charter school statute authorizes the operation of only a

[5]General Laws c. 71, § 89(*d*), sets forth the purposes of establishing charter schools:

"(1) to stimulate the development of innovative programs within public education; (2) to provide opportunities for innovative learning and assessments; (3) to provide parents and students with greater options in choosing schools within and outside their school districts; (4) to provide teachers with a vehicle for establishing schools with alternative, innovative methods of educational instruction and school structure and management; (5) to encourage performance-based educational programs; (6) to hold teachers and school administrators accountable for students' educational outcomes; and (7) to provide models for replication in other public schools."

limited number of charter schools.[6] *Id.* at § 89 (*i*). When granted, a charter authorizes the charter school to operate for a period of five years. *Id.* at § 89 (*kk*).

In Commonwealth charter schools, the boards of trustees, in consultation with the teachers, determine the curriculum and budget. *Id.* at § 89 (*x*). However, the curriculum, like other aspects of the charter school, must comply with the "provisions of law regulating other public schools," *id.* at § 89 (*t*) (exempting only certain provisions concerning teacher tenure and teacher demotion or dismissal). These provisions include compliance with G. L. c. 71A, which pertains to English language learners, and with G. L. c. 71B, which pertains to the provision of special education services. G. L. c. 71, § 89 (*t*). In addition, all charter school students "shall be required to meet the same performance standards, testing and portfolio requirements set by the board of education for students in other public schools." *Id.* at § 89 (*w*).

Substantial discretion is extended to the board in the process of granting a charter. The board is directed to "establish the information needed in an application for the approval of a charter school," provided that the application contains certain specified information.[7] *Id.* at § 89 (*f*). The board is charged with "mak[ing] the final determination on granting charter

---

[6]No more than 120 charter schools may operate in the Commonwealth at any time, and of that number, forty-eight "shall be reserved" for Horace Mann charter schools and seventy-two for Commonwealth charter schools. G. L. c. 71, § 89 (*i*). As of the date of the filing of the record appendix, there were forty-eight Commonwealth charter schools and six Horace Mann charter schools.

[7]An application for a charter "shall include but not be limited to a description of (1) the method for admission to a charter school; (2) the mission, purpose, innovation and specialized focus of the proposed charter school; (3) procedures for teacher evaluation and professional development for teachers and administrators; (4) the school governance and bylaws; (5) the financial plan for the operation of the school; (6) the educational program, instructional methodology, and services to be offered to students; (7) the number and qualifications of teachers and administrators to be employed; (8) the organization of the school in terms of ages of students or grades to be taught along with an estimate of the total enrollment of the school; (9) the provision of school facilities and pupil transportation; and (10) a statement of equal educational opportunity which shall state that charter schools shall be open to all students, on a space available basis, and shall not discriminate on the basis of race, color, national origin, creed, sex, ethnicity, sexual orientation, mental

school status and may condition charters on the applicant's taking certain actions or maintaining certain conditions." *Id.* at § 89 (*i*). The board may revoke a school's charter if the school "has not fulfilled any conditions imposed by the board in connection with the grant of the charter or [if] the school has violated any provision of its charter." *Id.* at § 89 (*kk*). The board may also place a charter school on "probationary status to allow the implementation of a remedial plan after which, if said plan is unsuccessful, the charter may be summarily revoked." *Id.* The board is charged with "develop[ing] procedures and guidelines for revocation and renewal of a school's charter," provided that, in the case of a Horace Mann charter school, the school committee and teachers' union vote in support of renewing its charter; and, in the case of a Commonwealth charter school, the board of trustees "has documented in a manner approved by the board . . . that said [C]ommonwealth charter school has provided models for replication and best practices." *Id.* at § 89 (*ll*).

The charter school statute and regulations promulgated by the Department of Education (department) establish the application process. Under the statute, a charter school comes into existence on the grant of a charter. G. L. c. 71, § 89 (*a*), (*b*). The board, subject to certain statutory prerequisites, see note 7, *supra*, determines the content of the applications, see G. L. c. 71, § 89 (*f*), and makes the final decision whether to grant a charter, see *id.* at § 89 (*i*). The statute provides a general timetable governing the process. "Applications to establish a charter school shall be submitted to the board each year by November 15," and the board "shall review the applications and grant new charters in February of the following year." *Id.* at § 89 (*h*). Applications are to be submitted to the board and are to be "filed with the local school committee for the school district in which the charter school is to be located." *Id.* at § 89 (*g*). Further, "[b]efore final approval to establish a [C]ommonwealth charter school the board of education shall hold a public hearing on said applications, and solicit and review comments on the ap-

or physical disability, age, ancestry, athletic performance, special need, or proficiency in the English language, and academic achievement." G. L. c. 71, § 89 (*f*).

plication from the local school committee for the school district in which said charter school is to be located." *Id.*

The department's regulations and guidelines track the statutory provisions and more particularly describe the application process. The application process begins in August of the year prior to the year in which the charter school plans to open if granted a charter, and culminates in the grant of a charter the following February. 603 Code Mass. Regs. § 1.04(1)-(3) (2005). In August,[8] prospective applicants must file a letter of intent with the department's charter school office. Generally speaking, the prospectus describes the basic elements of the applicant's plan and includes a variety of legal certifications. The department, however, provides a detailed description of what must be contained in the prospectus, provides an "outline" or template, and limits the document to twenty pages, exclusive of the cover page and specified documents and limited attachments (concerning the qualifications of the founding group members). Thereafter, reviewers from inside and outside the department review and evaluate each prospectus. Based on these advisory evaluations, the commissioner selects applicant groups to be invited to submit final applications. 603 Code Mass. Regs. § 1.04(1).

As noted, a final application must be submitted to the board by November 15. G. L. c. 71, § 89 (*h*). Copies must be sent to "the superintendent of the school districts from which the applicant intends to draw students," 603 Code Mass. Regs. § 1.04(3)(b), and to the local school committees, see G. L. c. 71, § 89 (*g*). In general terms, final applications must contain a detailed discussion of the proposed charter school's mission statement, educational philosophy, curriculum, assessment system, organizational plan, and plan for serving special student populations and providing other student services. See G. L. c. 71, § 89 (*f*); 603 Code Mass. Regs. § 1.05(1), (2) (2005). As with the case of prospectuses, the department provides a detailed description of what must be contained in the final application, provides an "outline" or template, and limits the document to fifty pages of text and thirty-five pages of "required and optional attachments." Prospectuses and final applications are

---

[8]The department establishes firm dates for all deadlines.

required to be submitted "in accordance with the schedule, application form, and guidelines established by the [d]epartment." 603 Code Mass. Regs. § 1.04(1).

From late November to January, local superintendents and school committees are invited to submit written comments concerning a final application. See G. L. c. 71, § 89 (*g*); 603 Code Mass. Regs. § 1.04(3)(b). During this time, the board and the department will hold at least one public hearing on the final application.[9] 603 Code Mass. Regs. § 1.04(3)(b). In the application package, the department explains:

> "All public comment, including written comment from superintendents [and school committees], will be considered in the review process. Several public hearings on the final applications are conducted during January. Written or oral opposition alone, however, is not reasonable grounds for denial of a charter. Similarly, strong public support alone does not constitute reasonable grounds for granting a charter. Any substantial issues raised in pubic comment that demonstrate deficiencies in a specific final application as measured against the stated criteria will be taken into account and addressed during the applicant group's interview with the [department's charter school office]."

Also in late November to January, each final application is reviewed and evaluated by review panels consisting of department staff and persons from outside the department such as current and former teachers; researchers; charter school founders; and school, business, and public policy leaders. As with the prospectus reviewers, the function of the review panels for the final application is solely advisory. See 603 Code Mass. Regs. § 1.04(3)(c) ("The [b]oard . . . may be assisted [in granting charters] by review panels comprised of individuals appointed by the [c]ommissioner [and] [m]embers of these panels may review applications but the reviewers' role shall be *solely advisory*" [emphasis added]). In the application materials, the department explains that "[t]he questions and deficiencies raised by review panels regarding final applications serve as the basis of the applicant group interviews."

---

[9]At least one member of the board must attend the public hearing. 603 Code Mass. Regs. § 1.04(3)(b) (2005).

Next, in January, each applicant group is interviewed by the department, which inquires into issues and comments raised by the review panels and others. 603 Code Mass. Regs. § 1.04(3)(a). The interview's purpose is "to better assess [the founding group's] qualifications to start a charter school." *Id.*

In February, the commissioner makes his recommendations to the board, which then votes on the commissioner's recommendations at its February meeting. G. L. c. 71, § 89 (*h*). The board then "make[s] the final determination on granting charter school status and may condition charters on the applicant's taking certain actions or maintaining certain conditions." *Id.* at § 89 (*i*). With respect to the statutory and regulatory criteria for assessing charter applications, see *id.* at § 89 (*f*); 603 Code Mass. Regs. § 1.05(1)(a)-(i), the board is permitted to "temporarily waive such conditions and award a charter, provided that the applicant submits adequate written assurance that all such conditions will be met prior to the opening of the school." 603 Code Mass. Regs. § 1.05(2). In addition, recognizing that the startup of a charter school involves "a tremendous undertaking," the department states in its application materials that the board may award a charter conditional on the school's opening in the year following the year in which the charter was granted.[10]

There is no statutory or regulatory provision permitting an appeal from the board's decision to grant a charter. As explained by the department in the application materials: "The application process leading up to the [b]oard's decision has been designed to afford applicant groups and others several opportunities to clarify misunderstandings related to an application and to make the case for, or against, the award of a charter. Applicants who are not awarded a charter . . . may reapply in the future."

Application fees for student admission to charter schools are prohibited. G. L. c. 71, § 89 (*f*). In addition, "[t]here shall be no tuition charge for students attending charter schools." *Id.* at § 89 (*n*). Commonwealth charter schools receive public funds directly from the Commonwealth. *Id.* at § 89 (*nn*). The funding

---

[10]The regulations provide that, "[i]f no students are attending a charter school within 19 months from the date the charter was granted, the charter will be null and void." 603 Code Mass. Regs. § 1.04(4)(b).

comes from the State through a reduction in the educational funding (at a calculated per pupil rate) for the towns from which the charter school draws its students. *Id.* Subject to appropriation, the Commonwealth may provide partial reimbursement to those towns for the reductions made. *Id.* at § 89 (*oo*).

2. We next set forth the material facts. In furtherance of its goal to establish a Commonwealth charter school, AMSA submitted to the department, on August 8, 2003, a letter of intent and, on September 8, 2003, its prospectus. Five reviewers performed independent examinations of AMSA's prospectus, identifying areas of both strength and weakness.

On November 14, 2003, AMSA submitted its final application to the department and, pursuant to G. L. c. 71, § 89 (*g*), sent copies of it to the local school committees, including the plaintiffs. By early January, several internal and external reviewers concluded their evaluations of AMSA's final application. In addition to providing written evaluations, the reviewers participated "on a half-day panel to discuss and evaluate every section of each application." In mid-January, the plaintiffs submitted written comments in opposition to AMSA's final application. The department held three public hearings, on January 12, 14, and 15, during which both public support and opposition to AMSA's final application was expressed.[11]

On January 30, 2004, the board interviewed the members of AMSA's founding group. During the interview, AMSA's founding group shared with the interviewers various materials that AMSA had continued to develop following the submission of its final application (interview submissions).[12] These interview submissions included a lengthy (approximately 203 pages)

---

[11]The board conducted one public hearing devoted primarily to the AMSA application on January 15, 2004, in Worcester.

[12]The plaintiffs call this material AMSA's "revised application." Unlike the final application that consisted of only 121 pages, the so-called "revised application" consisted of about 417 pages. The plaintiffs contend that the "[r]evised [a]pplication contains numerous substantive changes to [the final application], including an entirely new approach to special education services on an individualized basis." The plaintiffs contend (and it nowhere is disputed) that they were never given a copy of the "revised application." The plaintiffs state that they first learned of the revised application at the public hearing on the final application held on February 24, 2004. The plaintiffs maintain that they obtained a copy of the revised application through a public records request.

"Detailed [Mathematics] Curriculum" for students in grades six and seven; applications for employment; curriculum outlines for the subjects of physics, chemistry, computer usage, biology, literature, English, geography, and visual arts; an employee manual; and a student and family handbook. In addition, the submissions included a letter from the lead founder of AMSA, Dr. Julia Sigalovsky, to the commissioner made in response to the "valuable feedback from the community" and "to clarify some of the points that may not have been clear in [AMSA's] application, as well as [to] address what [AMSA] believe[s] are some common concerns and in some cases misunderstandings."[13] The department permitted all of the applicants, including AMSA, during the interviews "to elaborate on the main weaknesses or areas of confusion identified in the review of their applications or to clarify aspects of their applications."

On February 24, 2004, the board held a public meeting and voted (five to one) to grant AMSA a charter to open in September, 2005. The minutes of the hearing state the following:

> "Acting Associate Commissioner Kristin McIntosh provided an overview of the proposal and responded to questions. Chairman [James A.] Peyser asked if the charter school application had changed since the public comment period. Ms. McIntosh responded that the application did not change in a material way; rather, the founding group provided clarification on some issues about which questions had been raised during the interview process. Chairman Peyser asked about the school's plans for providing special education services as required by law. Ms. McIntosh said the proposal reviewers look for a commitment, a plan, understanding and agreement to meet the legal requirements, and that this school's founding group met

[13]The letter specifically addressed the following "key areas of expressed concerns": "(1) How the needs of academically weaker students will be addressed; (2) The level of the AMSA curriculum in comparison with the level of the curriculum in the district schools; (3) Whether the needs of special education students and English Language Learners will be adequately addressed; (4) AMSA's plans to hire qualified professionals to teach classes in math and science; (5) Whether the Founding Group has the necessary experience to start a school; (6) The need and local support for a charter school in the proposed area focused on math, science and technology; and (7) The allocation of resources, space needs, and the discipline system."

that standard. She added that, like all charter schools, this school will have to flesh out the details of its special education program before it opens. Chairman Peyser noted that the school has been criticized for focusing its program on advanced learning, and he asked if the founders understand that the school must serve all students, including students with disabilities and English language learners. Ms. McIntosh said that they do.

"Commissioner [David P.] Driscoll said the school's focus on advanced math and science makes it somewhat unique. The Department has done due diligence to ensure that the school is prepared to meet its legal obligations to educate all students. The Commissioner said he is satisfied that all of the issues raised in the January 23rd letter from Hudson had been addressed. Dr. [Roberta] Schaefer [a member of the board] said she is pleased that the concept of charter schools is expanding to include a variety of educational programs. She expressed concern that some letters opposing the charter school that she has received from public school students appear to be part of an orchestrated campaign. Commissioner Driscoll said in recommending this charter he does not credit any opinions the founders expressed about the inadequacy of existing public schools; rather, the charter should be granted on the strength of the proposed program and the fact that it meets the standards in the law."

AMSA opened in September, 2005.

3. We turn now to the governing law. In allowing cross motions for judgment on the pleadings for the defendants, the judge concluded that the plaintiffs had no right to judicial review of the board's decision to grant AMSA a charter through certiorari under G. L. c. 249, § 4; under G. L. c. 30A; or by means of a declaratory judgment under G. L. c. 231A.

a. *Certiorari.* The judge correctly concluded that the board's grant of a charter to AMSA is not subject to judicial review under the certiorari statute.[14] Certiorari is a limited procedure reserved for correction of substantial errors of law apparent on

---

[14]General Laws c. 249, § 4, establishes that "[a] civil action in the nature of certiorari to correct errors in proceedings which are not according to the course of the common law, which proceedings are not otherwise reviewable

the record created before a judicial or quasi-judicial tribunal. *St. Botolph Citizens Comm., Inc.* v. *Boston Redevelopment Auth.*, 429 Mass. 1, 7 (1999). To obtain certiorari review of an administrative decision, one must show "(1) a judicial or quasi-judicial proceeding; (2) a lack of all other reasonably adequate remedies; and (3) a substantial injury or injustice arising from the proceeding under review." *Warren* v. *Hazardous Waste Facility Site Safety Council*, 392 Mass. 107, 117 (1984), quoting *Boston Edison Co.* v. *Selectmen of Concord*, 355 Mass. 79, 83 (1968). If the proceeding or hearing involves "unsworn statements by interested persons advocating or disapproving the proposed new policy" rather than "sworn testimony by witnesses subject to cross-examination in a hearing preceded by specific charges," the hearing is more likely to be legislative or regulatory, rather than quasi-judicial, in nature. See *Pronghorn, Inc.* v. *Licensing Bd. of Peabody*, 13 Mass. App. Ct. 70, 72, 73 (1982). Further, if a hearing is not preceded by "specific charges" and is not "followed by the adoption of formal findings of fact," it is more likely to be regulatory in nature. *Id.*

Here, under the statutory and regulatory scheme, an applicant cannot be awarded a charter until the board conducts a public hearing. See G. L. c. 71, § 89 (*g*) ("Before final approval to establish a [C]ommonwealth charter school the [board] shall hold a public hearing on said applications . . ."); 603 Code Mass. Regs. § 1.04(3)(b) ("The [b]oard and the [department] shall hold a public hearing on final applications"). The hearing, however, is not preceded by specific charges. It serves only to provide an opportunity for public comment on a final application. There are no statutory or regulatory provisions requiring that witnesses testify or that sworn testimony be taken at the hearing, and the department is not provided an opportunity to cross-examine any persons who decide to verbalize concerns or submit written information. Following the hearing, the board is not required to issue any written decision with accompanying findings of fact. Based on these considerations, we conclude that the board's decision to grant AMSA a charter was not made

by motion or by appeal, may be brought in the supreme judicial or superior court . . . ."

in the context of a judicial or quasi-judicial proceeding. See *Pronghorn, Inc.* v. *Licensing Bd. of Peabody, supra.*

b. *General Laws c. 30A.* The decision to grant AMSA a charter was not made in an adjudicatory proceeding and, therefore, is not subject to judicial review under G. L. c. 30A. As noted by the judge, G. L. c. 30A, § 14, provides to an aggrieved party judicial review of a "final decision of any agency in an adjudicatory proceeding." If the decision is not made in an adjudicatory proceeding, a court will lack jurisdiction to review the decision pursuant to G. L. c. 30A, § 14. *Warren* v. *Hazardous Waste Facility Site Safety Council, supra.* An adjudicatory proceeding is defined by G. L. c. 30A, § 1 (1), as "a proceeding before an agency in which the legal rights, duties or privileges of specifically named persons are required by constitutional right or by any provision of the General Laws to be determined after opportunity for an agency hearing."

The plaintiffs contend that an adjudicatory proceeding took place because AMSA's right and privilege to operate a charter school "was determined by the [b]oard at the February 2004 'public hearing' required by [G. L. c. 71,] § 89 (*g*)." While the board did publicly make the determination to grant AMSA a charter at its February 24, 2004, meeting, and conducted more than one public hearing pursuant to G. L. c. 71, § 89 (*g*), the board's ultimate decision to grant AMSA the charter constituted an adjudication of AMSA's rights, not the plaintiffs'. Further examination of the nature of the proceedings, see *Sierra Club* v. *Department of Envtl. Mgt.*, 439 Mass. 738, 746 (2003), demonstrates that no adjudicatory proceeding occurred in the charter school application process.

The fact that a public hearing was required in the charter application process does not render the process or the public hearings an adjudicatory hearing. See *id.* See also *Reid* v. *Acting Comm'r of the Dep't of Community Affairs*, 362 Mass. 136, 140, 143 (1972). The public hearings were not of an adversary nature and were not conducted as such. Under the statutory and regulatory scheme, the board is not required to take formal testimony, hear or cross-examine witnesses, or assess the credibility of witnesses or information submitted at any public hearing. Nor is the board required to make any written decision

or particular findings of fact after any public hearing. Rather, the public hearing provides an opportunity for the public, including the local school committees if they so desire, to comment on the final application for the proposed charter school. The information provided at the public hearing, depending on its content, may be used to evaluate the final application before the board. However, the final decision to grant a charter at all times rests with the board. See G. L. c. 71, § 89 (*i*). A close examination of the process demonstrates that, with its resulting decision, it is legislative in nature.

We reject the plaintiffs' argument that, because a department regulation provides for judicial review under G. L. c. 30A of a decision to *revoke* a charter, see 603 Code Mass. Regs. § 1.13(3) (2005), judicial review under G. L. c. 30A must similarly be provided in the case of a decision to *grant* a charter. The two types of actions are entirely different. By its terms, the cited regulation does not speak to any judicial review available to school committees seeking to challenge the board's grant of a charter. Further, under the regulation, the only entity afforded judicial review in the case of the revocation of a charter is the charter school itself. See 603 Code Mass. Regs. § 1.13(3) ("Upon receiving a notice of intent to revoke a charter . . . the school shall have all rights of review as provided in [] G. L. c. 30A, § 13"). The regulation affords no right of judicial review to a school committee for the grant of a charter.

*c. Declaratory judgment.* In count three of their amended complaint, the plaintiffs seek a declaration that "the [d]ecision to grant a conditional charter to AMSA was illegal, improper or otherwise contrary to law." The judge determined that the plaintiffs are not entitled to declaratory relief because they "are not challenging a 'consistently repeated' practice" as required under G. L. c. 231A, § 2 (declaratory relief "may be used in the superior court to enjoin and to obtain a determination of the legality of the administrative practices and procedures of any municipal, county or state agency or official which practices or procedures are alleged to be in violation of the Constitution of the United States or of the constitution or laws of the commonwealth, or are in violation of rules or regulations promulgated under the authority of such laws, which violation has

been consistently repeated"). We also conclude that the plaintiffs are not entitled to declaratory relief, but for a different reason, namely, lack of standing.

To obtain declaratory relief in a case involving administrative action, "a plaintiff must show that (1) there is an actual controversy; (2) he has standing; (3) necessary parties have been joined; and (4) available administrative remedies have been exhausted." *Villages Dev. Co.* v. *Secretary of the Executive Office of Envtl. Affairs*, 410 Mass. 100, 106 (1991). The standards for determining standing under G. L. c. 231A are set forth in *Enos* v. *Secretary of Envtl. Affairs*, 432 Mass. 132, 135-136 (2000) (*Enos*):

> " 'A party has standing when it can allege an injury within the area of concern of the statute or regulatory scheme under which the injurious action has occurred.' *Massachusetts Ass'n of Indep. Ins. Agents & Brokers, Inc.* v. *Commissioner of Ins.*, 373 Mass. 290, 293 (1977). See *Bonan* v. *Boston*, 398 Mass. 315, 320 (1986) (standing requires 'a definite interest in the matters in contention in the sense that [a plaintiff's] rights will be significantly affected by a resolution of the contested point'). See also *Pratt* v. *Boston*, 396 Mass. 37, 42 (1985); *Doe* v. *The Governor*, 381 Mass. 702, 704-705 (1980). We have said that 'standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy.' *Pratt* v. *Boston, supra*, quoting *Valley Forge College* v. *Americans United for Separation of Church & State*, 454 U.S. 464, 486 (1982). It is settled that G. L. c. 231A does not provide an independent statutory basis for standing. *Pratt* v. *Boston, supra* at 42-43. See *Konstantopoulos* v. *Whately*, 384 Mass. 123, 127 (1981). To have standing here, the plaintiffs' interests must come within the ' "zone of interests" arguably protected by [the statute]. . . . [I]t is not enough that the plaintiff[s] be injured by some act or omission of the defendant; the defendant must additionally have violated some duty owed to the plaintiff[s].' *Penal Insts. Comm'r for Suffolk County* v. *Commissioner of Correction*, 382 Mass. 527, 532 (1981), quoting L.H. Tribe, American Constitutional Law § 3-22, at 97-98 (1978)."

> "The terms used to define a plaintiff's standing — 'injury within the area of concern'; 'definite interest in the matters

in contention'; 'violation of duty owed' — are elastic concepts that have different meanings for different parties. Plaintiffs asserting standing invariably see their interests as squarely within the disputed area of concern . . . . Defendants, on the other hand, invariably view the issue of standing more narrowly and, unless standing on the part of the plaintiffs is definitely present, seek to insulate the governmental conduct in dispute from judicial review. In the final analysis, we must decide whether standing exists by examining several considerations, including the language of the statute in issue; the Legislature's intent and purpose in enacting the statute; the nature of the administrative scheme; decisions on standing; any adverse effects that might occur, if standing is recognized; and the availability of other, more definite, remedies to the plaintiffs. In making our inquiry, we pay special attention to the requirement that standing usually is not present unless the government official or agency can be found to owe a duty directly to the plaintiffs."

We first note that the plaintiffs are seeking to challenge the board's approval of a charter to AMSA essentially on three grounds, asserting that the charter is invalid because (1) the board permitted AMSA to file a "revised" final application[15] and deprived the plaintiffs of receiving and commenting on that revised application in violation of their rights under G. L. c. 71, § 89 (*g*); (2) AMSA failed to provide a lawful special education plan in its final application; and (3) AMSA failed to make a proper showing of a need for its charter school in the four

---

[15]The plaintiffs mischaracterize the submissions of AMSA (following the submission of its final application) as a "revised application." We previously described these materials and labeled them "interview submissions." In contrast to the final application, the interview submissions were not made in compliance with the board's final application template. A review of the actual submissions demonstrates that they are clarifications to, and elaborations of, the final application. For instance, almost one-half of the interview submissions constituted a lengthy detailed mathematics curriculum for grades six and seven. While this document was not submitted in connection with the final application, a summary of the grade six and seven mathematics curriculum appears in the final application. Further, the detailed mathematics curriculum could not have been submitted with the final application because the final application is limited to fifty pages (template) and to only thirty-five pages of attachments. Hence, the plaintiffs' reliance on the length of the interview submissions in support of its position is misplaced.

towns in its region. The pertinent statute, on which the plaintiffs predicate standing, is G. L. c. 71, § 89 (*g*). The "duty" prescribed by § 89 (*g*) is twofold and involves (1) a duty on the part of AMSA to file a copy of its final application[16] "with the local school committee for the school district in which the charter school is to be located"; and (2) a duty on the part of the board "[b]efore final approval" to "solicit and review comments on the application from the local school committee for the school district in which said charter school is to be located." These "duties" were satisfied. AMSA sent copies of its final application to the plaintiffs, and before the board made its final decision, it solicited, and received, written comments on the final application from the plaintiffs.

Our review of the language and purpose of the charter school statute, its administrative scheme, and other pertinent considerations, satisfies us that the Legislature did not intend that school committees, in these circumstances, should be able to seek judicial review of the board's decision to grant a charter for a Commonwealth charter school. The statutory and regulatory scheme clearly discloses that, in the case of Commonwealth charter schools, the Legislature intended that school committees have a very limited role in the charter school process. This limitation appears in the very first provisions of the charter school statute where the definitions distinguish between a Commonwealth charter school and a Horace Mann charter school. See G. L. c. 71, § 89 (*a*), (*b*). The Legislature expressly states that a Commonwealth charter school is to operate "independently of any school committee." See *id.* at § 89 (*a*). In contrast, the Legislature has expressly subjected Horace Mann charter schools to school committee approval. See G. L. c. 71, § 89 (*b*). The distinction has legal significance.

The charter school statute itself limits the role of school committees in the charter school application process. Pursuant to G. L. c. 71, § 89 (*g*), a charter school applicant must send a copy of its final application to the local school committee or school committees, and the board, prior to granting a Commonwealth charter, must hold a public hearing and must solicit

---

[16]The regulations of the department clarify that the application to be filed is the "final" application. 603 Code Mass. Regs. § 1.04(3)(b).

and review comments on the final application from the local school committees. The statute contemplates that local school committees may have valuable insights, recommendations, or criticisms of a final application, and that the board should "review" and consider the insights, recommendations, or criticisms. However, this limited role of school committees in the process does not demonstrate, or equate with, a legislative intent that school committees may judicially challenge the board's decision to grant a Commonwealth charter. To rule otherwise would ignore the broad discretion afforded the board by the Legislature.

The charter school statute directs the board to establish the criteria, in addition to that set forth in the statute, for inclusion in a charter school application, see G. L. c. 71, § 89 (*f*). The statute also designates the board as the *final* decision maker on granting charters, and authorizes the board to impose unspecified conditions in connection with granting charters. See *id.* at § 89 (*i*). The board may revoke a charter, see *id.* at § 89 (*kk*), and is charged with developing the procedures and guidelines for the revocation of charters, see *id.* at § 89 (*ll*). The board may also place a charter school on probationary status. *Id.* at § 89 (*kk*).

In administering the charter school statute, the board has not relinquished its broad discretion. The board ensures that at least one of its members attends any public hearing on a final application. 603 Code Mass. Regs. § 1.04(3)(b). Also, although the board is assisted by reviewers in the evaluation of final applications, the role of the reviewers is only advisory. See 603 Code Mass. Regs. § 1.04(3)(c). Last, the board at no time expands a school committee's limited role in the process.

The charter school statute does not expressly contemplate clarifications or elaborations to a final application. The statute also does not prohibit receipt of such information. In view of the facts that the board establishes the criteria of an application, is the ultimate decision maker, and has authority to impose unspecified conditions on the grant of a charter, it necessarily follows that the board is implicitly authorized to accept, or even request, such information. Indeed, the administrative process provides for an opportunity, during the interview stage, for ap-

plicants to clarify orally any misunderstandings and verbally address any deficiencies appearing in the final applications. The Legislature could have provided that local school committees are to be provided with copies of every document in the charter school application process and be permitted to comment at every stage and in response to every document submitted. It declined to do so, most likely in recognition of the fact that such a role for local school committees would make the entire process unworkable and unwieldy. There is nothing in the statutory or regulatory scheme that suggests that the Legislature intended that school committees have the last word before the board votes.[17]

The purposes of establishing charter schools, essentially to provide greater options and opportunities for innovative learning within public education, see *id.* at § 89 (*d*), are not undermined by a determination that the plaintiffs lack standing. Although school committees also have these same general goals, the concerns are too broad and general in nature to form a basis for standing. See *Enos, supra* at 138 (stating, in dismissing claims of landowners adjacent to proposed sewage treatment facility, that "[t]o grant standing based on MEPA's ultimate goal of the protection of the environment would allow suit in almost every project within MEPA's jurisdiction, based on generalized claims by plaintiffs of injury such as loss of use and enjoyment of property").[18]

The statutory and regulatory scheme establishes a collabora-

---

[17]The legislative history of the Education Reform Act of 1993 supports our conclusion. During the legislative process, the Legislature considered and rejected two proposals, one in the form of a proposed amendment to 1993 House Doc. No. 801 that is referred to as the Travis Amendment, see 1993 House J. 28, and the other, a bill, 1993 House Doc. No. 4478, nearly identical to the Travis Amendment, that would have established the creation of "innovation schools," assigning control of the process of granting innovation school status to school committees and providing a review process (that ultimately permitted judicial review pursuant to G. L. c. 30A) for applicants denied that status or granted that status on unfavorable conditions. It is clear that the Legislature had considered establishing a different role for school committees and considered providing a judicial review process.

[18]The plaintiffs may experience some financial losses in connection with the funding of Commonwealth charter schools, see G. L. c. 71, § 89 (*nn*), (*oo*). The plaintiffs, however, have not sufficiently quantified that harm in terms of actual monetary deficiencies, reductions in "spending . . . for

tive process. We conclude that granting school committees standing to challenge the grant of Commonwealth charters will necessarily distort the collaborative purpose of the process, frustrate what was intended to be a nonadversary administrative procedure, and subvert the very purpose of the statutory scheme.

We add that the plaintiffs' concern about the provision of special education services at AMSA might be addressed by an alternate remedy. Under G. L. c. 71, § 89 (*jj*), a school committee "may complain to a charter school's board of trustees concerning any claimed violations of [G. L. c. 71, § 89,] by the school. If, after presenting their complaint to the trustees, the [school committee] believe[s] their complaint has not been adequately addressed, they may submit their complaint to the [board] which shall investigate such complaint and make a formal response."[19]

*Judgment affirmed.*

important educational services and resources (such as books, teachers, and activities)," "program losses," reduction of teachers, and reduction of athletic programs in the schools in their respective districts. This issue was raised at oral argument. The plaintiffs thereafter submitted a one-page letter that provided no additional information than that already contained in the record, despite the fact that AMSA has been operating since September of 2005. In any event, the statute does not create a right for the plaintiffs to redress such generalized injuries.

[19]Our conclusion that the plaintiffs cannot obtain judicial review obviates the need to address their remaining contentions, that AMSA's final application failed appropriately to address the special education needs of students, and that the board's decision to grant the charter to AMSA was not supported by substantial evidence, see 603 Code Mass. Regs. § 1.05(1)(b).