Cornetta, Roberta., J.
INTRODUCTION
On June 28,2010, the plaintiffs, Peter Dolan, Erika Andrews, Diane Bevins, Hugo Burnham, Kevin Clancy, Jane Cunningham, Josephine Curtis, Martin Del Vecchio, Friederike Grotjahn, Jason Grow, Jonathan Hardy, Shelley Morgan, Denise San Paolo, Leora Ulrich, and Maria Zervos (collectively the “Plaintiffs”), filed this Original Complaint against the defendants, the Commissioner of Elementary and Secondary Education, Mitchell Chester (“Commissioner Chester”), the Board of Elementary and Secondary Education (the “Board of Education”), the Department of Elementary and Secondary Education (the “Department”) (collectively the “State Defendants”), and the Gloucester Community Arts Charter School (the “GCA School”), in connection with a charter the Board of Education granted to the GCA School in February 2009. Shortly thereafter, on July 22, 2010, the Plaintiffs filed an Amended Complaint wherein they requested that the court: (1) issue a declaration stating that the charter is null and void; (2) enter an injunction to prevent the GCA School from opening; and (3) issue an injunction against the Department preventing it from distributing funds to the GCA School. The matter is currently before the court on three motions: (1) the GCA School’s Motion for Summary Judgment; (2) the State Defendants’ Motion for Summary Judgment; and (3) the Plaintiffs’ Motion for Summary Judgment. For the reasons set out infra, the GCA School’s Motion for Summary Judgment and the State Defendants’ Motion for Summary Judgment will be ALLOWED, while the Plaintiffs’ Motion for Summary Judgment will be DENIED.
*62 BACKGROUND
The undisputed material facts are as follows.
I. Statu toiy Framework
In 1993, as part of the Education Reform Act, St. 1993, c. 71, §55, the state Legislature enacted the Charter School Statute, G.L.c. 71, §89.[4] See School Comm. of Hudson v. Board of Educ., 448 Mass. 565, 567-69 (2007) (hereinafter “Hudson"). The Charter School Statute provides for the creation of two types of charter schools: Commonwealth charter schools and Horace Mann charter schools.[5] G.L.c. 71, §§89(a) &(b) (now§89(c)); see also 603 Code Mass.Regs. §1.02. Both types of charter schools are designed to: “stimulate the development of innovative programs within public education”!;] “provide opportunities for innovative learning”!;] “provide ... a vehicle for establishing schools with alternative innovative methods of educational instruction and school structure and management”!;] and “encourage performance-based educational programs!.]” G.L.c. 71, §89(d) (now §89(b)). A charter granted by the board “shall be for five years.” G.L.c. 71, §89(kk) (now §89(dd)).
The Board’s process for determining whether to grant a charter begins in “August of the year prior to the year in which the charter school plans to open,” when applicants submit prospectuses to the Department, which “described!] the basic elements of the applicants’ plants].” Hudson, 448 Mass. at 570; see also 603 Code Mass.Regs. §1.04(1). Then, “reviewers from inside and outside the [Department review and evaluate each prospectus.” Hudson, 448 Mass. at 570. Based on these initial evaluations, the Commissioner then “invitéis] selected applicants to submit final applications,” which must be submitted to the Department by November 15th. 603 Code Mass.Regs. §1.04(1); G.L.c. 71, §89(h) (now §89(i)(l)).
After submission, the final applications are “reviewed and evaluated according to the criteria outlined in [603 Code Mass.Regs. §1.05] and in the charter school application itself.” 603 Code Mass.Regs. §1.04(3)(a). The Department “provides a detailed description of what must be contained in the final application, provides an ‘outline’ or template, and limits the document to fifty pages of text and thirty-five pages of ‘required and optional attachments.’ ” Hudson, 448 Mass. at 570. Generally speaking, “final applications must contain a detailed discussion of the proposed charter school’s mission statement, educational philosophy, curriculum, assessment system, organizational plan, and plan for serving special student populations.” Id.; see also 603 Code Mass.Regs. §1.05(1).[6]
The review process continues through late November and the following January. During this time, the Department “shall hold a public hearing on final applications and solicit and review comments on the application from the school committees of the school districts from which the applicant intends to draw students.” 603 Code Mass.Regs. §1.04(3)(b) (now §1.04(4));[7] see also G.L.c. 71, §89(g) (“Before final approval to establish a commonwealth charter school the [B]oard of [Education shall hold a public hearing on said applications, and solicit and review comments on the application from the local school committee for the school district in which said charter school is to be located”) (now §89(h)).[8] At least one member of the Board is required to “attend public hearings soliciting comment on the merits of pending applications.” 603 Code Mass.Regs. §1.04(3)(b) (now §104(4)).[9]
Next, each final application “is reviewed and evaluated by review panels consisting of [Department staff and persons from outside the [D]epartment such as current and former teachers; researchers; charter school founders; and school, business, and public policy leaders.” Hudson, 448 Mass. at 571. Notably, however, the function of the review panels is “solely advisory.” 603 Code Mass.Regs. 1.04(3)(c) (“The Board . . . may be assisted [in the review] process by review panels . . . but the reviewers’ role shall be solely advisory”) (now § 1.04(5)). Once the review panels have finished evaluating the final applications, the Department conducts interviews with final applicant groups “in order to better assess their qualifications to start a charter school.” 603 Code Mass.Regs. §1.04(3)(a) (now § 1.04(3)). At this point, the Charter School Office completes a written summary of all materials and makes a recommendation to the Commissioner regarding whether approval of the charter application is warranted.
In January, based on the findings of the Charter School Office and a review of the final applications, the Commissioner decides which application groups he should recommend to the Board for approval. Hudson, 448 Mass. at 572. Finally, in February, the Board votes on the Commissioner’s recommendations, making “the final determination on granting charter school status!.]” G.L.c. 71, §89(i) (now §89(j)). The Board’s decision to grant or deny a charter application is given “broad discretion.” Hudson, 448 Mass. at 582, citing G.L.c. 71, 89(1) (now §89(j)).
II. The GCA School’s Charter
In August 2008, seven charter school applicant groups, including the group proposing to establish the GCA School, submitted prospectuses to the Department’s Charter School Office. Joint Appendix to Combined Rule 9(A)(b)(5) Statement of Unexpected Material Facts with Regard to Plaintiffs’ Motion for Summary Judgment (“Joint App.”), Ex. 1, Attach. C, p. 1. Subsequently, in November 2008, Commissioner Chester invited three of the applicant groups to submit final applications: (1) one from the GCA School; (2) one from an applicant group proposing to establish a charter school in Waltham; and (3) one from an applicant group proposing to establish a charter school in Worcester. All three applicant groups submitted their final applications on November 14, 2008. Thereafter, *63 the Charter School Office commenced review of each application.
As part of the review process, public hearings were scheduled in order to allow for comment on each of the proposed charter school applications. The original schedule provided for a hearing in Gloucester on December 1, 2008, a hearing in Waltham on December 4, 2008, and a hearing in Worcester on December 9, 2008. Joint App., Ex. 1, Attach. P. These dates were selected based upon the availability of members of the Board and the availability of the facilities used to host the hearings. On November 20, 2008, however, at the request of Gloucester’s Superintendent of Schools, the Gloucester hearing was rescheduled for December 11, 2008. Following this schedule change, between November 20, 2008 and December 11, 2008, the Department’s Chief of Staff, Heidi Guarino (“Guarino”), attempted to arrange for a member of the Board of Education to attend the hearing in Gloucester. Joint App., Ex. 1, Attach. R, S, & T. Despite Guarino’s efforts, the Gloucester hearing took place without a member of the Board in attendance.
During the review of the final applications, the Department appointed nineteen reviewers to evaluate the final applications, including professionals from the Department, nine outside reviewers, and a professional from the Department of Children and Families. Joint App., Ex. 1, Attach. C,p. 1; Ex. 2, p. 8. The outside reviewers were chosen to participate in the application process because they “[had] something positive to add to the [Department’s] process.” Joint App., Ex. 1, Attach. LL, pp. 53-54. The reviewers were asked to complete a tweniy-nine-page “Final Application Review Rubric” and to provide an assessment of whether and how completely the applicant group addressed each application criteria. Joint App., Ex. 1, Attach. C, pp. 1-2; Ex. 2, p. 8. These criteria were divided into three main categories: (1) creating an academic program that will support student achievement; (2) organizational viability; and (3) faithfulness to the proposed mission. The reviewers were then asked to provide an overall rating for each of the three categories.[10] Joint App., Ex. 1, Attach. C, pp. 1-8; Ex. 2, p. 8.
While this process was still underway, on January 16, 2009, Commissioner Chester sent a memorandum (the “January Memo”) to the members of the Board entitled “Charter School Applications.” Joint App., Ex. 1, Attach. L. In the January Memo, Commissioner Chester informed the Board that at the meeting scheduled for February 24, 2009 (the “February Meeting”), he would be asking the Board to consider three pending charter school applications. Joint App., Ex. 1, Attach. L, p. 1. The January Memo also indicated that Commissioner Chester would, at the February Meeting, make a recommendation to the Board as to which, if any, applicant group met the criteria for approval “[biased on the review of each applicant against the criteria, feedback received from the review panels, public comment, and information from the final interviews!.]” Joint App., Ex. 1, Attach. L, p. 1. Attached to the January Memo was an eight-page document entitled “Charter Application Review Process and Criteria for Review,” which described the Department’s process for reviewing the applications and included a recitation of the criteria used by the Department to evaluate each charter school application. Joint App., Ex. 1, Attach. L, p. 2; Attach. C, pp. 1-8.
On January 16, 2009, Commissioner Chester issued a second memorandum to the members of the Board entitled “Charter Schools — Waiver of [603 Code Mass.Regs. § 1.04(3)(b)].” Joint App., Ex. 1, Attach. U, p. 1. In this memo, Commissioner Chester explained that “despite best efforts, no [B]oard member was able to attend the hearing [in Gloucester] on December 11th.” Joint App., Ex. 1, Attach. U, p. 1. He indicated that “audiotapes of the hearing!] • • ■ [were] available upon request” and, ultimately, recommended that, in order to “eliminate any question about the process,” the Board “vote to waive its regulatory requirement with respect to the public hearing [held in Gloucester] on December 11th.” Joint App., Ex. 1, Attach. U, p. 1. Thereafter, at a meeting on January 27, 2009, the Board cited 603 Code Mass.Regs. §1.03(2) and voted to “waive the requirement in [603 Code Mass.Regs. §1.04(3)] with respect to attendance by a member of the [B]oard at a public hearing soliciting comments on the merits of pending [charter school] applications.” Joint App., Ex. 1, Attach. W, p. 13.
Once the review panels completed their independent evaluations, they met collectively to discuss each applicant group’s strengths and weaknesses with respect to the specified criteria and identified issues. Joint App., Ex. 1, Attach. LL, pp. 21-22; Attach. NN, p. 45. Following this discussion, staff from the Charter School Office interviewed representatives from each of the applicant groups. Joint Appendix of Materials Cited in the Support of Opposition to the State Defendant’s Motion for Summary Judgment (the “State Def’s Joint App. ”) Tab F, p. 3, pars. 10-11; Tab D, p. 3, pars. 8-11. After all the interviews were complete, in January 2009, the Charter School Office prepared a summary (the “Summary”) of the conclusions reached by the reviewers. Joint App., Ex. 1, Attach. E. As to the GCA School, the Summary states, “RECOMMENDATION: DO NOT RECOMMEND.” Joint App., Ex. 1, Attach. E, p. 1. (emphasis in original). The Summary also provides, in part, that
[t]he founding group [of the GCA School] is not recommended to be chartered because overall they did not meet the criteria for the final charter application. During the interview, they demonstrated that they might possess the capacity to open and oversee a charter school but it was not clear that it would be successful in the three areas of charter school accountability; creating an academic program that will support student achievement, organ *64 izational viability, and faithfulness to the proposed mission described in the charter application. We would encourage them to reapply in a subsequent year.
Joint App., Ex. 1, Attach. E, p. 1. The Summary also contained “DO NOT RECOMMEND” references for the applicant groups from Waltham and Worcester. Joint App., Ex. 1, Attach. E, pp. 3 & 6.
On February 2, 2009, senior members of the Department, Ruth Hersh (“Hersh”), Mary Street (“Street”), and Jeffrey Wulfson (“Wulfson”), met to discuss the Summary and their recommendations concerning the three applicant groups. Joint App., Ex. 1, Attach. MM, pp. 30-31. At this meeting, Hersh, Street, and Wulfson agreed that they would inform Commissioner Chester that it was their recommendation that the GCA School’s application not be approved. Joint App., Ex. 1, Attach. MM, pp. 30-32; Attach. LL, p. 27. On February 4, 2009, Hersh, Street, and Wulfson met with Commissioner Chester to convey their recommendations. Joint App., Ex. 1, Attach. F. At this meeting, Commissioner Chester questioned his staff regarding their views of the strengths and weaknesses of the GCA School’s application, including the merit of its proposal to integrate arts across the curriculum. State Def.’s Joint App., TabF,p. 3 par. 12; Tab G, pp. 55-56. Wulfson told Commissioner Chester that the GCA School’s application was a “close call” and he felt that the Charter School Office was being too conservative. Joint App., Ex. 1, Attach. MM, pp. 31-34. At the conclusion of this meeting, Commissioner Chester stated that he wanted to read the GCA Charter School application himself and take some time to think about it. State Def.’s Joint App., Tab F, p. 3, par. 12.
On the next day, Thursday, February 5, 2009, Commissioner Chester flew to Arizona to attend a conference where he remained until Sunday, February 8, 2009. Joint App., Ex. 1, Attach. H. While Commissioner Chester was at the conference, on February 5, 2009, at 11:54 p.m., the Commonwealth’s Secretary of Education, Paul Reville (“Secretary Reville”), sent him an email which reads as follows:
Hope all’s well and warm in AZ. I appreciated our talk today and your openness and flexibility. This situation presents one of those painful dilemmas. In addition to being a no win situation, it forces us into a political cul de sac where we could be permanently trapped. Our reality is that we have to show some sympathy in this group of charters or we’ll get permanently labeled as hostile and that will cripple us with a number of key, moderate allies like the Globe and the Boston Foundation. Frankly, I’d rather fight for the kids in the Waltham situation but it sounds like you can’t find a solid basis for standing behind that one. I’m not inclined to push Worcester, so that leaves Gloucester. My inclination is to think that you, I and the Governor all need to send at least one positive signal in this batch, and (sic) I gather that you think the best candidate is Gloucester. Can you see your way clear to supporting it? Would you want to do the financial trigger even in light of likely stimulus aid?
Thanks for not seeing this as an independent issue. It really is a matter of positioning ourselves so that we can be viable to implement the rest of our agenda. It’s a tough but I think necessary pill to swallow. Let’s discuss some more tomorrow.

Joint App., Ex. 1, Attach. I.

Subsequently, at 10:57 p.m., on February 6, 2009, Secretary Reville sent an email to the Chief Financial Officer for the Executive Office of Education, David Bunker, stating, in relevant part, that
I talked with [Commissioner Chester] about the charter school approval process. It looks like we’ll go ahead with Gloucester. He’s looking for a financial health benchmark and thinking about the foundation budget as the best one ... He indicated that he didn’t think Gloucester would have a problem reaching the foundation.
Joint App., Esc. 1, Attach. J. In addition, while Commissioner Chester was still in Arizona, Secretary Reville sent another email to the Chief of Staff at the Executive Office of Education, Kendra Medville, stating, in pertinent part, that
[Commissioner Chester] is ready to approve Gloucester. He will attach a financial benchmark for starting, probably hitting the foundation budget ... All in all this is about as good a resolution of many tensions as we can hope for. The decision will be very unpopular in Gloucester. [The Board of Education] meeting will likely be besieged.
Joint App., Ex. 1, Attach. K. Following these communications, when he returned from Arizona, Commissioner Chester informed Hersh, Street, and Wulfson that he had decided to recommend that the Board grant a charter to the GCA School. Commissioner Chester reached this conclusion after considering the GCA School application, the views of the Department staff, and the public comments regarding the GCA School and determining that the application had “substantial merit.” Joint App., Ex. 1, Attach. MM, pp. 81-82; State Def.’s Joint App., Tab A, p. 3, par. 11; Tab B, pp. 56-57; Tab G, pp. 67-68, 77-79.
On February 13, 2009, Commissioner Chester sent two memoranda to the Board members in anticipation of the upcoming February Meeting. The first was entitled “Briefing for the [February Meeting]” and outlined the agenda for the February Meeting. The Briefing indicated that Commissioner Chester would, “after [having] careful[ly] reviewed] [the charter school applications],” be recommending that the Board grant a charter to the GCA School. Joint App. Ex. 1, Attach. M, pp. 3-4. The second was entitled “Charter School Applications — Recommendations for New Charters— *65 Application Cycle 2008-2009.” Joint App., Ex. 1, Attach. D. In this document, Commissioner Chester stated, “(t]he Department’s Charter School Office conducted a rigorous, multi-step review of the final applications” and indicated that he was recommending approval of the GCA School’s application. Joint App. Ex. 1, Attach. D, pp. 1-2. Neither memorandum mentions Commissioner Chester’s communications with Secretary Reville or the Charter School Office’s advice to him that the GCA School application not be approved. Finally, with respect to the other applicant groups for Waltham and Worcester, Commissioner Chester wrote, “(a]s a result of the review process I determined that the two other proposals needed further development and revision with respect to one or more of the criteria.” Joint App., Ex. 1, Attach. D, p. 2.
At the February Meeting, the Board considered the GCA School’s application. Joint App., Ex. 1, Attach. N, pp. 3-4. During the presentation of his recommendation, Commissioner Chester stated that he was recommending approval of the GCA School’s application “based on the viability and quality of the application" and “his belief that the school has a strong prospect of success.” Joint App., Ex. 1, Attach. N, p. 3. He did not inform the Board that the Charter School Office had recommended that the GCA School applicant group not be awarded a charter or tell the Board about his communications with Secretary Reville. At the conclusion of the discussion regarding the GCA Charter School, the Board awarded the GCA Charter School a charter (the “Charter”) by a six to four vote. Joint App., Ex. 1, Attach. N, pp. 4-5.
III. Procedural History
The Plaintiffs filed the Original Complaint on June 28, 2010. Shortly thereafter, on July 22, 2010, the Plaintiffs filed the Amended Complaint, seeking to add the City of Gloucester and requesting a declaration that the Charter be deemed “null and void,” an injunction to prevent the GCA School from opening, and an injunction prohibiting the Department from authorizing and distributing funds to the GCA School. In response, on August 4, 2010, the State Defendants filed an appearance and the GCA School filed its Motion to Dismiss. Shortly thereafter, on August 10, 2010, the Plaintiffs filed an Opposition to the Motion to Dismiss and a Motion for Preliminary Injunction. On August 24, 2010, after hearing, the court (Welch, J.) allowed the Motion to Dismiss with respect to the City of Gloucester and denied the Motion for Preliminary Injunction.
At the time it dismissed the City of Gloucester from the case, the court (Welch, J.) instructed the parties that, if they were unable to resolve their differences by the end of 2010, they should appear before the court “in early January 2011.” This was not done. Rather, on June 17, 2011, the Plaintiffs filed a Renewed Motion for Preliminary Injunction. On July 21, 2011, the court (Cometía, J.) denied this motion and set forth strict deadlines for the completion of discovery, the filing of summary judgment motions, and the scheduling of trial in order to resolve the uncertainty this case has created for parents, students, school administrators, and budget planners. In compliance with this ruling, the GCA School, the State Defendants, and the Plaintiffs filed the pending motions in early November 2011.
DISCUSSION
The GCA School and the State Defendants assert similar arguments. Essentially, they contend that they should be awarded summary judgment because the court lacks subject matter jurisdiction over the Plaintiffs’ claims. On the other hand, the Plaintiffs argue the court has jurisdiction to hear this matter and that it should properly be resolved in their favor. The court addresses the parties’ arguments in more detail below.
I. Standard of Review
Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The moving party bears the burden of affirmatively showing that there is no triable issue of fact. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Cornmc’ns Corp., 410 Mass. 805, 809 (1991). The non-moving party cannot defeat the well-pled motion for summary judgment by resting on its pleadings; rather, it must respond by alleging specific facts demonstrating the existence of a genuine fact. Correllas v. Viveiros, 410 Mass. 314, 317 (1991). The court views the evidence in the light most favorable to the nonmoving party, but does not weigh evidence, assess credibility, or find facts. Attorney Gen. v. Bailey, 386 Mass. 367, 370-71 (1982).
II. Subject Matter Jurisdiction
The GCA School and the State Defendants’ arguments regarding subject matter jurisdiction are really two-fold. First, they contend that the court lacks subject matter jurisdiction over the Plaintiffs’ claims because the Charter School Statute does not provide for a private cause of action. Second, they claim that the court lacks subject matter jurisdiction because the Plaintiffs lack standing under Hudson, 448 Mass. at 574-84. While the Plaintiffs do not clearly address the argument regarding whether the Charter School Statute contains a private cause of action, they do contend that they have standing and further, that the court should not revisit the question of standing under the *66 “law of the case” doctrine since it has already been answered in the affirmative.
“Subject matter jurisdiction is ‘jurisdiction over the nature of the case and the type of relief sought’ ...” Doe No. 3974 v. Sex Offender Registry Bd., 457 Mass. 53, 56 (2010), quoting Middleborough v. Housing Appeals Comm., 449 Mass. 514, 520 (2007). It “cannot be conferred by consent, conduct, or waiver.” Marker v. Holyoke, 390 Mass. 555, 559 (1983), citing Litton Business Sys. v. Commissioner of Revenue, 383 Mass. 619, 622 (1981). “The question at the heart of subject matter jurisdiction is, ‘has the Legislature empowered the [court] to hear cases of a certain genre?’ ” Doe No. 3974, 457 Mass. at 56-57, quoting Wachovia Bank, Nat'l Ass’n v. Schmidt, 546 U.S. 303, 316 (2006). Whether a given statute allows for a private cause of action is a question of subject matter jurisdiction. See Mulhern v. MacLeod, 441 Mass. 754, 755 (2004). Standing is also a question of subject matter jurisdiction. Indeck Maine Energy v. Commissioner of Energy Res., 454 Mass. 511, 516 (2009).
A. The Plaintiffs’ Private Cause of Action
The GCA School and the State Defendants contend that the court lacks subject matter jurisdiction over the Plaintiffs’ claims since the Charter School Statute does not provide for a private cause of action. The court agrees. In order to assert a claim under a specified statute, a plaintiff must establish that the identified statute provides for a private cause of action. Here, “(t]here is no statutory or regulatory provision [explicitly] permitting an appeal from the [B]oard’s decision to grant a charter.” Hudson, 448 Mass. at 572. And, while in certain circumstances the courts may “infer” a private right of action, Salvas v. Wal-Mart Stores, Inc., 452 Mass. 337, 372 (2008), they are reluctant to do so “in the absence of some indication from the Legislature supporting such an inference,” Loffredo v. Center for Addictive Behaviors, 426 Mass. 541, 544 (1998). This is because “[t]he absence of a private right of action is not a mere technicality, it reflects a Congressional judgment that private litigation is not an appropriate means to ensure achievement of legislative goals.” Boston Med. v. Secretary of the Exec., No. 09-2959-BLS2, *24 (Mass.Super. Dec. 21, 2010) (slip op.) (Fabricant, J.) [28 Mass. L. Rptr. 105]. In the present case, the court finds no hint in the statutoiy language to indicate that the Legislature intended to provide a private cause of action. On the contraiy, as the Supreme Judicial Court has stated, “the Legislature did not intend that [third parties] . . . should be able to seek judicial review of the [BJoard’s decision to grant a charter!.]” Hudson, 448 Mass. at 581.
B. The Plaintiffs’ Standing
Next, the GCA School and the State Defendants contend the court lacks subject matter jurisdiction for the additional reason that the Plaintiffs do not have standing, pursuant to Hudson, to challenge the Board’s decision to issue the Charter. The Plaintiffs claim that arguments regarding standing are barred by the “law of the case” doctrine, but, even if not barred, they have sufficiently demonstrated their standing because, under Hudson, they fall within the “zone of interests” protected by the Charter School Statute. The court disagrees with the Plaintiffs’ reading of Hudson and concludes that they do not have standing.
1. The “Law of the Case” Doctrine
Before addressing the standing issue, the court notes that it does not consider the “law of the case” doctrine a bar to granting summary judgment to either the GCA School or the State Defendants. The law of the case doctrine reflects a “reluctance ‘to reconsider questions decided . . . earlier ... in the same case.’ ” King v. Driscoll, 424 Mass. 1, 7-8 (1996), quoting Peterson v. Hopson, 306 Mass. 597, 599 (1940). This doctrine is, however, “permissive and not mandatory.” Salter v. Salter, 363 Mass. 396, 402 (1973). In fact, “under the law of the case doctrine, a second judge does have the power until final judgment to rule differently from the first judge on ‘an issue or a question of fact or law once decided’ in order to reach a just result.” Catalano v. First Essex Sav. Bank, 37 Mass.App.Ct. 377, 384 (1994), quoting Goulet v. Whittin Machine Works, Inc., 399 Mass. 547, 554 (1987).
In the instant case, final judgment has not entered and thus, the court is not barred from reconsidering the standing question. More importantly, however, the court does not consider its current decision to be wholly inconsistent with the earlier decision. In its earlier decision, the court (Welch, J.) states that “[t]here is no indication that the legislature intended to completely exclude students/parents from enforcing the charter school statute against blatant abuses” and “the Hudson case does not stand for such a startling result.” Ruling on Defendants’ Motion to Dismiss and Plaintiffs’ Motion for Preliminary Injunction, p. 5 (Paper #16). The court does not necessarily disagree. It is conceivable that there may be some instances, even under Hudson, where third-party plaintiffs may be able to demonstrate standing to challenge the Board’s issuance of a charter. The court concludes, however, that these instances would, by necessity, be exceedingly rare and limited to circumstances where the plaintiffs are able to establish some type of extreme malfeasance or misfeasance on the part of the charter school’s administrators. The instant case is not that case.
2. Standing
“A party has standing when it can allege an injury within the area of concern of the statute or regulatory scheme under which the injurious action has occurred.” Hudson, 448 Mass. at 579 (internal quotations and citations omitted). However, “standing is not measured by the intensity of the litigant’s interest or *67 the fervor of his advocacy.” Id. (internal quotations and citations omitted). Rather, to have standing, a plaintiff must demonstrate that its interests come within “the zone of interests” arguably protected by the governing statute. Id. (internal quotations and citations omitted). The court concludes that, under Hudson, the Plaintiffs do not fall within this protected zone.
In Hudson, the Supreme Judicial Court concluded that school committees do not have standing to challenge the Board’s decision to grant a charter because they do not fall within the zone of interests protected by the Charter School Statute. 448 Mass. at 581-84. In reaching this decision the Supreme Judicial Court reasoned that the Legislature specifically intended to provide school committees with a “very limited role in the charter school process,” which did not coincide with an “intent that school committees may judicially challenge the [B]oard’s decision to grant a. . . charter, Id., at 581-82. Ultimately, the Supreme Judicial Court concluded that ’’granting school committees standing to challenge the grant of . . . charters . . . [would] distort the collaborative purpose of the process, frustrate what was intended to be a non-adversary administrative procedure, and subvert the very purpose of the statutory scheme." Id. at 584.
Here, the Plaintiffs argue they are distinguishable from the Plaintiffs in Hudson because the Legislature has not provided them with a statutorily defined role in the process for determining whether a charter should be granted. The court finds this distinction unpersuasive. If anything, as the GCA School and the State Defendants point out, the absence of a specifically delineated role for parents weighs more heavily in favor of concluding that the Legislature did not intend for parents to be able to challenge the Board’s decision to grant a charter. In fact, likely recognizing that the establishment of a charter school can be a highly contested and often divisive issue, the Legislature granted the Board broad discretion in the administration of the Charter School Statute and the related regulations. The Charter School Statutes states that the Board makes the “final” determination as to whether to grant charter school status and authorizes the Board to impose unspecified conditions in connection with granting charters. G.L.c. 71, §89(i) (now §89(j)). Thus, in the absence of some egregious misconduct on the part of the charter school administrators, the court concludes that parents do not have standing to challenge the Board’s decision to grant a charter.
III. The Validity of the Charter
Even if the court were to resolve the standing question in favor of the Plaintiffs, they have not demonstrated that the Board’s decision to grant the Charter was illegal or beyond its authority. The Plaintiffs argue that the Board’s approval of the Charter was illegal and should be deemed “null and void” because the Department failed to adequately ensure that the GCA School’s applicant group met the relevant criteria and because no member of the Board attended the public hearing in Gloucester on December 11, 2008. In response, the GCA School and the State Defendants claim that the Charter is valid because there was sufficient basis for the Board’s approval and further, the failure of a Board member to attend the hearing is not fatal and does not warrant voiding the Charter. The court agrees with the GCA School and the State Defendants.
When the Board granted the Charter it specifically stated it was doing so “in accordance with [G.L.c. 71, §89, and 603 Code Mass.Regs. §1.00].” Thus, as the GCA School and the State Defendants point out, the Board’s vote reflects a finding that the GCA School’s applicant group met all of the statutory and regulatory requirements and criteria for granting a charter. The record establishes that the Board based its decision on the written applications, the Charter School Office’s summary, the applicant group interviews, the public comments submitted in support and opposition to the GCA School, and the recommendation of Commissioner Chester. Contained within this documentation, there was sufficient basis for the Board’s determination that the GCA School had met the relevant criteria. [11]
Finally, the failure of a member of the Board to attend the public hearing in Gloucester on December 11,2008 does not void the Charter because the statute and regulations in effect at the time required only a single public hearing on all pending charter applications and the Board, in this case, held three hearings two of which were attended by Board members. More specifically, the Charter School Statute in effect in 2008 read as follows:
[b]efore final approval to establish a commonwealth charter school the [B]oard of [Education shall hold a public hearing on said applications, and solicit and review comments on the application from the local school committee for the school district in which said charter school is to be located.
G.L.c. 71, §89(g) (emphasis added). Similarly, the Charter School Regulations in effect provided that:
the [B]oard shall hold a public hearing on final applications and solicit and review comments on the application from the school committees of the school districts from which the applicant intends to draw students.
603 Code Mass.Regs. §1.04(3)(b).
Clearly, the use of the singular “hearing” along with the plural “applications” indicates there could be a single hearing on all pending charter applications. This interpretation is reasonable and supported by the fact that when the Charter School Statute was amended in 2010 the Legislature clarified this language requiring the Board to:
*68 hold a public hearing on the application in the school district in which the proposed charter school is to be located and solicit and review comments on the application from the local school committee of each school district from which the charter school is expected to enroll students and any contiguous districts.
G.L.c. 71, §89(h), as amended by St. 2010, c. 12, §7.[12] The Board cannot be charged with violating regulations or statutory provisions that were not in effect at the time it took action. Further, even if the Plaintiffs were able to establish that the Board violated some procedural requirement, the court is not convinced that the proper remedy would be to deem the Charter void where there is no evidence that the GCA School engaged in any wrongdoing, and where such a result would visit extreme disruption upon students who have now been in attendance at the GCA School for some two years now.
ORDER
Accordingly, it is hereby ORDERED that:
1. the GCA School’s Motion for Summary Judgment be ALLOWED,
2. the State Defendants’ Motion for Summaiy Judgment be ALLOWED; and
3. the Plaintiffs’ Motion for Summaiy Judgment be DENIED.
The Clerk Magistrate shall now enter judgment upon the docket accordingly in this matter and provide notice to the parties pursuant to Rule 58.

 The Charter School Statute has been amended several times since 1993, most recently by St. 2010, c. 131, §51, effective July 1, 2010. Similarly, the Charter School Regulations, 603 Code Mass.Regs. §1.00 et seq., have been revised on a number of occasions. Unless otherwise noted, throughout this decision, the court refers to the statutory provisions and regulations in effect during the 2008-2009 application cycle when the GCA School’s charter application was reviewed.

 The main distinction between the two types of charter schools is that, prior to formation, a Horace Mann charter school needs the approval of the local school committee while a Commonwealth charter school does not require such approval. See G.L.c. 71, §89(a)&(b) (describing both types of charter schools) (now §89(c)).

 More specifically, a charter applicant must demonstrate, among other things, the ability to: (1) “further the purposes for establishment of charter schools”!;] (2) “conform with . . . all. .. applicable laws and regulations”!;] (3) “meet its enrollment projections”!;] (4) “provide educational models . . . that can be replicated by other public schools”!;] (5) “develop a management structure and plan which enables the charter school to achieve the goals and mission set forth in its charter”!;] (6) “meet the same performance standards and assessment requirements set by the (B]oard for students in other public schools ”[;] (7) “develop an accountability plan ... to help measure the school’s progress and success in raising student achievement, establishing a viable organization, and fulfilling the terms of its charter”!;] (8) “administer its educational programs, school operations, and finances effectively"!;] (9) “develop an enrollment policy”!;] (10) “provide school facilities that are in compliance with municipal building codes and other applicable laws ... adequate to meet the school’s program requirements!.]” 603 Code Mass.Regs. §1.05(1).

 The Charter School Regulations were revised and currently state as follows:
[t]he Board and the Department, for final applications, shall hold a public hearing in the school district in which a proposed charter school is to be located and solicit and review comments on the application from the school committees of the school district(s) from which the applicant is expected to enroll students and any contiguous districts.
603 Code Mass.Regs. §1.04(4).

 The Charter School Statute was amended and currently to reads as follows:
[bjefore final approval to establish a commonwealth charter school, the board shall hold a public hearing on the application in the school district in which the proposed charter school is to be located and solicit and review comments on the application from the local school committee of each school district from which the charter school is expected to enroll students and any contiguous districts.
G.L.c. 71, §89(h).

 The Charter School Regulations were revised and currently state as follows: “[a]t least one member of the Board shall attend each public hearing soliciting comment on the merits of pending applications and shall report to the Board on the hearing.” 603 Code Mass.Regs. §1.04(4). The Charter School Statute was also amended and currently provides that, “[a]t least 1 member of the [B]oard shall attend the public hearing,” G.L.c. 71, §89(h).

 According to the State Defendants, each individual reviewer did not necessarily examine each final application.

 Notably, neither Commissioner Chester’s communications with Secretary Reville nor the Charter School Office’s advice not to grant the Charter change this outcome. First, there is no indication that Commissioner Chester made his decision based on his communications with' Secretary Reville rather than on the applicable statutory and regulatory requirements. In essence, Secretary Reville’s comments are similar to the many other comments submitted in support or opposition. And, the communication in and of itself does not establish any wrongdoing. Second, the Commissioner is the head of the Department and as such he is charged with making recommendations to the Board. There is no support for the contention that his recommendation cannot be contrary to that of the Charter School Office over which he has supervisory authority.

 The Charter School Regulations were also revised to reflect this amendment. See 603 Code Mass.Regs. §1.04(4).